IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CORNELIA NOEL,<br>　　Plaintiff,<br><br>v.<br><br>SHELL OIL COMPANY,<br>SHELL INTERNATIONAL E&P, INC.<br>AND DEBO OLADUNJOYE,<br>　　Defendants. | §<br>§<br>§<br>§　CIVIL ACTION NO. 4:15-cv-1087<br>§<br>§<br>§<br>§<br>§<br>§ |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Cornelia Noel files this Response to Defendants' Motion for Summary Judgment, and in support, respectfully shows as follows:

## I. INTRODUCTION

After Ms. Noel reported that she was being unlawfully treated because of her gender, Shell repatriated her back to the United States because of her complaints. Moreover, when it repatriated Ms. Noel, Shell assigned her to a department with insufficient available work and that was not the best fit for her skillset. Even worse, after repatriating Ms. Noel, Shell assigned her to work with the same individuals against whom Ms. Noel had raised her allegations. In addition, Shell allowed those individuals to taint Ms. Noel's performance rating. After Ms. Noel complained of the discriminatory rating she was given for 2014, Shell first tried to terminate Ms. Noel based upon performance. Given how discriminatory and retaliatory such an action would appear, Shell tried a different approach: it simply eliminated Ms. Noel's position. Thereafter, because of Ms. Noel's low ratings, she told to focus her job search efforts on positions external to Shell. After Ms. Noel was unable to find another position within Shell, her employment was terminated. This suit followed.

1

## II.   FACTUAL BACKGROUND

In October 2008, Plaintiff began her employment with Shell. Ex. 1.  By all objective measures, Ms. Noel was having a very successful career for Shell.   Ex. 1.   Ms. Noel routinely received excellent annual performance appraisals and regular raises in her compensation.   Ex. 1.

**A.   Plaintiff Complains of Gender Discrimination**

In 2012, Plaintiff accepted an assignment with Shell Nigeria to fill the vacant Discipline Head–Subsea Hardware role.   Ex. 1.   Upon starting in the role, Ms. Noel noticed that she was treated differently because of her gender.  Ex. 1.   For example, during her pre-assignment interview, Ms. Noel was told that, since she was a female, she needed to be a "calming" influence on David March, who was the Discipline Head—Subsea Systems in Shell Nigeria. Ex. 1.   In addition, until a suitably qualified candidate could be found, David March supported some aspects of the Discipline Head—Subsea Hardware role.   Ex. 1.

It became apparent to Ms. Noel that she was a token female employee whose role was to simply act as Mr. March's babysitter, and not in her capacity as Discipline Head–Subsea Hardware.   Ex. 1.   Ms. Noel's instructions and directions were ignored whenever it did not align with David March's own viewpoints.  Ex. 1.   This negatively impacted Plaintiff's work activities and Plaintiff's perceived performance.   Ex. 1.   For example, when Plaintiff reached out to her team to collaborate and seek solutions, she was admonished by her direct supervisor, Debo Oladunjoye.   Ex. 1.   According to Mr. Oladunjoye, Ms. Noel's job was to "manage" Mr. March's moods and to align with his decisions.   Ex. 1.   Ms. Noel complained to Mr. Oladunjoye that it was not her job to placate David March, and that her real focus should be on the team putting forward their best work efforts.   Ex. 1.   Ms. Noel further complained that she should be given her due respect as the Discipline Head–Subsea Hardware.   Ex. 1.   However, Mr. Oladujnjoye repeatedly failed to address Ms. Noel's complaints.   Ex. 1.

Thereafter, Plaintiff pressed on with getting the job done but continued to be shut down, ignored and overruled by her male peers.  Ex. 1.  Ms. Noel was often criticized for having a work style that was abrasive and "unladylike."  Ex. 1.  In fact, the Asset Manager, Mr. Fadeyi, indicated that Plaintiff came off as an "alpha male" and Mr. Okoye, the Engineering and Asset Manager told Plaintiff that if she would just act like a lady, everything would work out since "by the standards in any culture," Plaintiff is "physically attractive."  Ex. 1.  In other words, when Plaintiff went to her team to discuss the ongoing issues she was having, the response was that all Plaintiff needed do is "stop acting as a mother hen" over her staff and focus on nurturing David March.  Ex. 1.  Because she did not agree to the difference in treatment she was receiving because of her gender, Plaintiff continued to complain of gender discrimination and participated in Human Resources' Investigation of her claims of "Bullying and Gender Bias" in the workplace.  Ex. 1.  Shell's "investigation" into Plaintiff's complaints found no evidence of gender bias.  Ex. 1.  Rather, Shell attacked Plaintiff, claiming that she was the person who was the cause of workplace tension and slowing work progress.  Ex. 1.

**B.    Ms. Noel Begins Receiving Lower Performance Rankings**

Thereafter, Ms. Noel received her 2013 Annual Goals and Performance Appraisal Report. In her 2013 Annual Goals and Performance Appraisal Report, Ms. Noel received a very low mark (0.7).  Ex. 1.  The 2013 Annual Goals and Performance Appraisal Report contained inaccurate and false information.  Ex. 1.  Moreover, the Appraisal Report was completed without any input from Plaintiff, in violation of Shell's policies and procedures.  Ex. 1.  Ms. Noel approached Human Resources for help to correct the report.  Ex. 1.  However, her report was ignored.  Ex. 1.

Plaintiff's 2013 Annual Goals and Performance Appraisal Report was based on impermissible factors.  Ex. 1.  For example, Mr. Oladunjoye improperly stated that HAZOPs

3

was a forum for peer collaboration on the subsea hardware design, which can be shown to be absolutely false. Ex. 1. Based upon a false representation, Mr. Oladunjoye then gave Plaintiff negative marks for her performance with respect to her role in HAZOPs for 2013. Ex. 1. However, even after being made aware that Plaintiff's participation in HAZOPs was appropriate for her role, and after being provided evidence that she had not received any negative mid-year feedback on HAZOPS, Human Resources allowed the negative comments to stand and be used to justify the performance assessment rank given to Plaintiff. Ex. 1. Mr. Oladunjoye also accused Plaintiff of failing to disclose her engagement in supporting MSC Students Projects Engagement and the improper use of Shell data to support those projects. Ex. 1. However, Plaintiff's email correspondence from October 2012 through March 2013 demonstrate that her activities were not only well-known to both Shell International and Shell Nigeria, but also show the project details as well as the non-use of Shell data. Ex. 1.

The lack of any adverse mention of this activity at Plaintiff's mid-year performance assessment review shows Mr. Oladunjoye's statements were knowingly false. Ex. 1. Therefore, there can be no question that this should not have been used to justify the performance assessment rank given. Ex. 1. Plaintiff's 2013 Annual Goals and Performance Appraisal Report were intentionally peppered with inaccuracies and false statements. Ex. 1. Mr. Oladunjoye even publicized in the 2013 report Plaintiff's participation in the Human Resources investigation on "Bullying and Gender Bias," as well as the outcome of that investigation. Ex. 1. Mr. Oladunjoye's reference to Plaintiff's participation in that investigation violates Shell's policies and procedures. Ex. 1.

When Shell's Human Resources team reviewed Plaintiff's complaints, the team did not correct any of the negative, malicious, and false information contained in Plaintiff's report. Ex. 1. Nor did Shell correct Plaintiff's performance rating. Ex. 1. Rather, Plaintiff received a

4

0.7 (does not meet expectations). Ex. 1. That rating of 0.7 (does not meet expectations) negatively impacted Plaintiff's ability to be considered for career progression opportunities within Shell. Ex. 1.

C. **Ms. Noel is Repatriated Because of Her Discrimination Complaints**

In 2014, Plaintiff continued to be bullied and belittled by her peers and the Shell Leadership Team (including Mr. Oladunjoye) in retaliation for her complaints regarding her being singled out and treated differently for being female and regarding the retaliatory 2013 Annual Goals and Performance Appraisal Report. Ex. 1. On March 21, 2014, Plaintiff was told that because of the complaints she made, she would be removed from the role Discipline Head – Subsea Hardware and transferred back to Houston. Ex. 1; Ex. 29. The decision to repatriate Ms. Noel because of her complaints was made by Jamie Allen, a human resources official who worked in Shell's Houston office. Ex. 29; Ex. 3, p. 10. According to Shell, because Plaintiff raised her complaints, Plaintiff demonstrated "performance problems," showing that she could not get along with people, and causing her to be repatriated. Ex. 3, p. 9, l. 17-p. 10, l. 1, p. 32, l. 16-20; Ex. 4, pp. 102-03. Notably, Shell acknowledges that being repatriated because of her complaints is troublesome, and violates Shell's policies. Ex. 3, p. 86; Ex. 5, pp. 21-22. Yet, despite Shell making it known in the company the reason for Ms. Noel's repatriation, no one investigated those actions. Ex. 3, p. 86; Ex. 5, pp. 21-22.

Plaintiff continued to work in her role as Discipline Head – Subsea Hardware through June 2014. Ex. 1. Although the department to which Plaintiff was being transferred was not the best fit for her skillset, and despite the fact that there was not a suitable position for her, the department was nevertheless instructed to take Ms. Noel, and would not change their mind. Ex. 3, p. 11, p. 45, l. 3-8, p. 52; Ex. 6; Ex. 8. Plaintiff then returned to Texas to work as the Global SURF Projects Lead. Ex. 1; Ex. 3, p. 11.

Prior to accepting the new role, Plaintiff was told that she would be providing support to all Shell's international SURF activities. Ex. 1. However, upon assuming her new role, Plaintiff was restricted to supporting Shell Nigeria—the same entity whose employees bullied, harassed, and then retaliated against Plaintiff for previously complaining about the discrimination and harassment. Ex. 1. Moreover, this improperly imposed work limit eroded Plaintiff's status within Shell, and severely hampered Plaintiff's ability to make a meaningful difference to Shell's Global SURF projects and/or be eligible for new career opportunities. Ex. 1.

**D.      Shell Allows Ms. Noel's Previous Supervisors to Taint Ms. Noel's Ratings**

Each year, Shell assigns each employee an Individual Performance Factor ("IPF") rating. Ex. 3, p. 24, l. 22-23, p. 25. The range for the annual IPF is between . 4 and 1.5. Ex. 3, p. 25, l. 2-5. Although Plaintiff produced satisfactory work throughout 2014, while in Nigeria, and as the SURF Projects Lead, Plaintiff's annual appraisal improperly focused solely on subjective "soft" skills, which Shell management relied upon to criticize her work. Ex. 1. Under its policies, Shell is supposed to appraise performance against mutually agreed annual goals that are Specific, Measurable, Actionable, Realistic, and Time-Bound, known as the "SMART Plan." Ex. 1. However, Plaintiff's 2014 Annual Goals and Performance Appraisal Report did not follow Shell's SMART Plan. Ex. 1.

Instead, Plaintiff's 2014 Annual Goals and Performance Appraisal focused only on subjective criteria, which included comments such as Plaintiff being a "know-it-all" and contained language blaming Plaintiff for suboptimal project outcomes that Plaintiff actually tried to prevent by her timely recommendations, which were ignored. Ex. 1. Plaintiff has numerous examples of her spot-on work recommendations (which should have been taken into consideration) in her SMART plan. Ex. 1.

6

**E.      Shell Recommends that Ms. Noel's Employment be Terminated**

For 2014, Ms. Noel worked for two different departments with two different supervisors. Of course, the supervisor for the first half of the year was one of the individuals about whom Ms. Noel had raised her complaints. Ex. 1. For the second part of the year, Ms. Noel reported to Gouri Venkataraman. Ex. 1; Ex. 3, p. 12, l. 8-13. For Ms. Noel's 2014 IPF, Mr. Venkataraman collaborated with Ms. Noel's previous supervisor to formulate the annual IPF. Ex. 3, p. 27, l. 19-p. 28, l. 8. Not surprisingly, although Ms. Noel had worked with Mr. Venkataraman for only a short time, he claimed to notice performance issues with her performance. Ex. 4, pp. 93-94; Ex. 8. Mr. Venkataraman also recommended that Ms. Noel be terminated, despite that he had worked with her for such a short period of time, which raised a red flag for Human Resources. Ex. 4, pp. 55, 93-94. Mr. Venkataraman then contacted Human Resources to suggest that they "get on the same page" regarding the treatment of Ms. Noel. Ex. 26.

Much like what Ms. Noel endured under her previous supervisor, Mr. Venkataraman never provided Ms. Noel with any specific feedback regarding any performance issues. Ex. 10. Shell ranked Plaintiff a 0.5 for 2014 Annual Goals and Performance Appraisal Report. Ex. 1; Ex. 21. The ranking of .5 was an unheard of job rank at Shell--even for poor performers. Ex. 1; Ex. 3, p. 31, l. 14-21. In addition, the ranking was in line with a continual decline in her annual ranking since the time that she accepted the position in Nigeria, when her ranking went from .9 in 2012, .7 in 2013 and then a .5 in 2014. Ex. 1; Ex. 21. Human Resources simply instructed Mr. Venkataraman to represent that he in fact had given feedback to Ms. Noel. Ex. 7. This was false. Ex. 10.

After Mr. Venkataraman recommended Ms. Noel's termination, Kelly Rogers in Human Resources began digging into Plaintiff's performance history, and prepared a "discipline

7

summary" pertaining to Ms. Noel. Ex. 4, p. 81; Ex. 19-21, 27. According to Ms. Rogers, when she received the assignment, she was informed that Ms. Noel's situation was a "complicated employee relations issue." Ex. 4, p. 81; Ex. 5, p. 10. Ms. Rogers then recommended Ms. Noel's termination based upon the issues raised in Ms. Noel's 2014 annual review, which included the input from the individuals about whom Ms. Noel had complained. Ex. 5, p. 18; Ex. 21. Tellingly, Ms. Rogers recommended termination without ever speaking with Ms. Noel. Ex. 5, p. 21. Prior to Ms. Noel's termination, Shell's progressive discipline policy was not utilized. Ex. 4, p. 40. Recognizing that there was no legitimate evidence to justify terminating Ms. Noel, Shell subsequently claimed that the recommendation to terminate was not followed. Ex. 4, p. 56. Rather, Shell claimed that, coincidentally, Ms. Noel's position was eliminated around the same time. Ex. 4, p. 56.

On December 12, 2014, Plaintiff applied for the position of Delivery Manager-Major Projects. Ex. 1. Plaintiff was eminently qualified for the position of Delivery Manager-Major Projects. Ex. 1. However, Plaintiff was not considered for the Delivery Manager-Major Projects position because of her 2013 and 2014 Annual Goals and Performance Appraisal Report scores. Ex. 1.

F.     **Ms. Noel Complains of her Discriminatory Performance Ratings**

In December 2014, Plaintiff complained that her performance reviews, including the evaluation from Mr. Venkataraman, were false and discriminatory based upon her gender and her previous complaints of gender discrimination. Ex. 1; Ex. 3, p. 35, l. 18-p. 36, l. 4, p. 59, l. 19-p. 60, l. 20; Ex. 4, p. 77; Ex. 5, p. 14; Ex. 9. Plaintiff also complained that her performance reviews were done in contrast to Shell's established policies and procedures for performance reviews. Ex. 1. Therefore, Plaintiff asked that her performance review be reviewed by Human Resources. Ex. 1; Ex. 3, p. 43, l. 18-25, p. 60, l. 4-12; Ex. 9.

**G.     Noel Continues to Raise her Discrimination Complaints**

In January 2015, Ms. Noel continued to raise her complaints of discriminatory performance ratings that she had received.  Ex. 1; Ex. 2; Ex. 11; Ex. 23.  When Ms. Noel continued to raise her complaints, Shell began looking at other ways to seek to terminate Ms. Noel (since the earlier attempts based upon performance were not successful).  Indeed, in previously recommending termination, Human Resources candidly acknowledged that the potential risk of such a move is that the action would smack of discrimination and retaliation.  Ex. 21, p. 12.

It is clear that when Ms. Noel continued to raise her complaints, management sought to hurry the process in finding a basis to fire Ms. Noel.  Ex. 22; 32.  Shell attempted to hurry the process prior to the annual launch of the job search system, so that Ms. Noel would be unable to even search for another job.  Ex. 32.  After no action was taken on Plaintiff's complaint, in February 2015, Plaintiff again complained that her performance reviews were discriminatory based upon her gender and retaliatory based upon her previous complaints of gender discrimination.   Ex. 1. Therefore, Plaintiff again requested that Shell review her 2013 and 2014 Annual Goals and Performance Appraisal Reports.  Ex. 1.  In response, management pressured Human Resources into hurrying the process for terminating Ms. Noel.  Ex. 23.

Almost immediately after making her request, Plaintiff was informed that her job role had become "redundant" and her position was being eliminated.  Ex. 1; Ex. 14; Ex. 17.  As a result, Plaintiff was told to look for alternative roles at Shell to apply to.  Ex. 1.  However, at that same time, Plaintiff's supervisor told Plaintiff that because of her low performance ratings, she should seek work opportunities external to Shell.  Ex. 1; Ex. 3, p. 58; Ex. 14.  Plaintiff's supervisor told Plaintiff that her performance assessment reports over the previous 2-year period made it impossible for Plaintiff to obtain an internal job at Shell.  Ex. 1.  On April 9, 2015,

9

Plaintiff was told that April 30, 2015 would be her last day at Shell if she could not find another position within Shell by that time. Ex. 1. On April 30, 2015, Plaintiff was terminated from Shell. Ex. 1.

### III.   ARGUMENT

#### A.   Noel Engaged in Protected Activity

As described above, Ms. Noel clearly engaged in protected activity under Title VII. In arguing that Noel's reports are not protected activity, Shell focuses only on a small portion of Ms. Noel's overall complaints and completely ignores the complaints made by Ms. Noel upon her repatriation. The reason for this is simple: Shell is hoping to confuse the issues and mislead the Court into believing that Ms. Noel made no other complaints other than those in Nigeria. As set forth above, this is clearly false.

In addition, Shell ignores the fact that in order for complaints to be protected under Title VII, the employee need not report an actual violation of the law. Rather, the employee need only show that he or she "reasonably believes" that the conduct complained of constitutes a violation of the statute. *See Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001). Therefore, it is clear that Ms. Noel has sufficient evidence that she engaged in protected activity under Title VII.

#### B.   Noel's Protected Activity Caused Her Termination

Shell makes little attempt to refute that the decision to terminate her employment was retaliatory. Shell's own employees confirmed the retaliatory animus. Rather, Shell contends that even if it harbored animus for Ms. Noel's complaints, that they were not protected under Title VII, and therefore cannot serve as the basis for her retaliation claim. As explained above, Shell's position is without merit, since Ms. Noel clearly made numerous complaints of discrimination upon her return to the United States.

C. **Noel Has Substantial Evidence of Pretext**

Finally, Ms. Noel has substantial evidence that the reason offered for her termination is false, and is being used by Shell to mask its unlawful motivation for Ms. Noel's termination. Specifically, Shell would have the Court believe that Ms. Noel was terminated simply because she was unable to secure another position after her job eliminated. In fact, however, this position first ignores the retaliation to which Ms. Noel was subjected prior to the claimed elimination of the position, and Ms. Noel's wrongful placement into that position in the first place. Moreover, in disclosing those who had input into the decision to termination, the positions do not line up with the people who would have had input, if Shell's position were true. For example, Shell has acknowledged that Jamie Allen—the Human Resources official who first repatriated Ms. Noel based upon her complaints—was a decisionmaker with respect to Ms. Noel's termination. Ex. 34. Similarly—others who demonstrated animus toward Ms. Noel and her complaints were also involved in the decision. Ex. 34.

D. **Noel Has Sufficient Evidence that Her Termination was Motivated by Gender**

In addition to the Ms. Noel's evidence of retaliation, as shown above, Ms. Noel also has offered evidence that her termination was motivated by her gender. Accordingly, Ms. Noel's evidence, along with the evidence of pretext, clearly present issues for a jury to resolve. As a result, Defendants' Motion for Summary Judgment must be denied.

E. **Objections to Shell's Summary Judgment Evidence**

Plaintiff objects to much of Shell's Summary Judgment Evidence. In offering the testimony in support of its Motion, Shell has offered evidence that was never previously disclosed. In its Disclosures, Shell provides only very general identifications of potential witnesses, and the testimony relied upon in its Motion for Summary Judgment was never included within the substance of anticipated testimony for those witnesses, as required by Rule

26. Ex. 35. As such, the statements offered by Shell in support of its Motion for Summary Judgment should be stricken.

## IV.  CONCLUSION

Because there are numerous issues of fact to be resolved by a jury, Shell's Motion for Summary Judgment should be denied.   A proposed Order is attached.

                Respectfully submitted,

                CLINE | AHMAD

                /s/ Nasim Ahmad
                Nasim Ahmad
                Texas Bar No. 24014186
                24900 Pitkin, Suite 300
                The Woodlands, Texas 77386
                Telephone:   (832) 767-3207
                Telecopier:   (281) 864-4379

                ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this the 21st day of March, 2017, I sent via the ECF System a true and correct copy of the above and foregoing document to all counsel of record, as follows:

Lori M. Carr, lcarr@estesokon.com
Terah Moxley, tmoxley@estesokon.com
ESTES OKON THORNE & CARR PLLC
3811 Turtle Creek Blvd., Suite 2000
Dallas, Texas 75219

                /s/ Nasim Ahmad
                Nasim Ahmad