IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CORNELIA NOEL                    *
    Plaintiff                    *
                                 *
v.                               *          CIVIL ACTION NO.
                                 *            4:15-cv-01087
                                 *
SHELL OIL COMPANY, SHELL         *
INTERNATIONAL E&P, INC.,         *
and DEBO OLADUNJOYE              *
    Defendant                    *

_____

ORAL DEPOSITION OF
KELLY ROGERS
January 6, 2017

_____

        ORAL DEPOSITION OF KELLY ROGERS, produced as a
witness and duly sworn by me at the instance of the
Plaintiff, was taken in the above-styled and numbered
cause on the 6th of January, 2017, from 9:53 a.m. to
1:53 p.m., before Mike R. Raska, CSR in and for the
State of Texas, reported/recorded by machine shorthand,
at One Shell Plaza, 910 Louisiana Street, Conference Room
#48000, Houston, Texas 77002, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on the
record or attached hereto.

Kelly Rogers
January 6, 2017

2

1                    A P P E A R A N C E S

2

3      COUNSEL FOR PLAINTIFF

4            Mr. Nasim Ahmad
             Ahmad & Capodice
5            24900 Pitkin, Suite 300
             The Woodlands, Texas 77386
6            (832) 767-3207
             nahmad@cline-ahmad.com

7

8      COUNSEL FOR DEFENDANTS

9            Ms. Terah Moxley
             Estes, Thorne & Carr
10           3811 Turtle Creek Boulevard, Suite 2000
             Dallas, Texas 75219
11           (214) 599-4026
             (214) 599-4099 fax
12           tmoxley@esteshornecarr.com

13

       ALSO PRESENT:
14
             Ms. Cynthia Glass Bivins
15           Ms. Cornelia Noel

16

17

18

19

20

21

22

23

24

25

Kelly Rogers
January 6, 2017

3

INDEX

PAGE

Stipulations ...................................... 1

Appearances ....................................... 2

KELLY ROGERS

Further Examination by Mr. Ahmad................... 4

Signature and changes ............................ 156

Reporter's Certificate ........................... 157


EXHIBITS

NO.  DESCRIPTION                          PAGE LINE

1    E-mail.................................... 23   9

2    E-mails................................... 32  21

3    "Discipline Summary - As of December 31, ... 41   6
     2014"

4    E-mail.................................... 70  21

5    E-mail.................................... 72   7

6    E-mail.................................... 84   1

7    E-mail with "Complainant Affidavit"........ 121  20

8    E-mails................................... 131  16

9    E-mails................................... 135  13

10   E-mails................................... 140  14

Kelly Rogers
January 6, 2017

4

```
 1                      KELLY ROGERS,
 2    having been first duly sworn, testified as follows:
 3                      EXAMINATION:
 4    BY MR. AHMAD:
 5         Q.    State your name, please.
 6         A.    Kelly Rogers.
 7         Q.    All right.  Good morning, Ms. Rogers.
 8         A.    Good morning.
 9         Q.    How are you?
10         A.    Good.  How are you?
11         Q.    I'm good, thanks.  My name is Nasim Ahmad.  I'm
12    a lawyer.  I represent Cornelia Noel in a lawsuit against
13    Shell, do you understand that?
14         A.    Yes.
15         Q.    Okay.  And do you know Ms. Noel?
16         A.    Not personally.
17         Q.    All right.  Have you ever met her before?
18         A.    I don't believe so.
19         Q.    Okay.  But you know the name?
20         A.    Yes.
21         Q.    All right.  Well, how do you know the name?
22         A.    Based on work that I did in late 2014 and early
23    2015.
24         Q.    Okay.  And what kind of work was that, as it
25    applies to Ms. Noel?
```

Kelly Rogers
January 6, 2017

5

```
 1        A.    The main piece of work was creating a summary

 2    document for my boss at the time.

 3        Q.    And who was your boss at the time?

 4        A.    Alyssa Snider.

 5        Q.    She is no longer your boss?

 6        A.    No.

 7        Q.    When did she stop becoming your boss?

 8        A.    July 2015.

 9        Q.    Who is your boss now?

10        A.    Arinda Price.

11        Q.    All right.  And what is your job title today?

12        A.    HR account manager for pipeline and chemicals.

13        Q.    How long have you had that title?

14        A.    Since April 2016.

15        Q.    What was your title before?

16        A.    HR account manager for projects and technology,

17    projects and engineering services.

18        Q.    For how long did you have that title?

19        A.    More or less, until April 2016.  I was

20    technically an HR analyst from July 2014, when I started

21    at Shell, until about January 1st, 2015.

22        Q.    Okay.  And so when you prepared the summary

23    document for Ms. Snider, your title was HR analyst?

24        A.    I believe so.

25        Q.    Okay.  And then effective January 1st, 2015 you
```

Kelly Rogers
January 6, 2017

6

1    became an HR account manager?

2         A.    Yes.

3         Q.    All right.  And then in April of 2016 you went

4    to pipeline and chemicals?

5         A.    Yes.

6         Q.    Doing the same work, same duties?

7         A.    Yes.

8         Q.    Just for a different department?

9         A.    Yes.

10         Q.    Okay.  All right.  Have you ever testified

11    before?

12         A.    No.

13         Q.    All right.  Tell me what you have done to

14    prepare for your testimony today.

15         A.    I met with our attorney yesterday --

16         Q.    Okay.

17         A.    -- to discuss what to expect.

18         Q.    Okay.  Did you review any documents?

19         A.    Yes.

20         Q.    What documents did you review?

21         A.    The discipline summary.

22         Q.    Anything else?

23         A.    The -- I don't know exactly what to call it.

24    The letter from Ms. Noel detailing some of her

25    complaints, concerns.

Kelly Rogers
January 6, 2017

7

1      Q.    Is that the 15-, 16-page --

2      A.    Yeah, the 15-page --

3      Q.    -- complaint and affidavit?

4      A.    Yes.

5      Q.    Okay.  Had you read that before?

6      A.    I believe so.

7      Q.    Okay.  All right.  Anything else that you

8    recall reviewing to prepare for your testimony today?

9      A.    No.

10     Q.    All right.  And did those two documents that

11   you reviewed, did they refresh your memory at all?

12     A.    To some extent.

13     Q.    Okay.  When you heard that you were scheduled

14   to give a deposition, did you already recall who Ms. Noel

15   was and basically recall what the issues were?

16     A.    Yes.

17     Q.    Okay.  Why were you asked to prepare the

18   discipline summary from -- I assume Ms. Snider is the one

19   who asked you to prepare that?

20     A.    Yes.  Ms. Snider did.

21     Q.    Okay.  And you prepared it for Ms. Snider?

22     A.    Yes.

23     Q.    Why were you asked to prepare it?

24     A.    There were a large number of e-mails from

25   various sources that Alyssa had kind of compiled, but no

Kelly Rogers
January 6, 2017

8

1    one person had actually gone through and read all the

2    e-mails, and they were very, you know, disorganized, on a

3    variety of topics, so she asked me to kind of look

4    through all of them and put them, organize them into one

5    summary so that it would be easier to understand all the

6    different pieces that had happened.

7        Q.    Okay.  And do you know why she wanted that

8    done?  Did she explain what the purpose was?

9        A.    Yes.  She explained that there is just so many

10   e-mails, and she didn't necessarily know what was in all

11   the e-mails, and she wanted a concise, more-accessible

12   document that would summarize what was in those e-mails.

13       Q.    Okay.  What was in the e-mails?  What was the,

14   what was the subject of the e-mails that you were

15   summarizing?

16       A.    From what I recall, the majority of the e-mails

17   were with regards to Ms. Noel's, you know, concerns about

18   her working environment as well as her management's

19   response to those concerns.

20       Q.    Is one of your duties to investigate workplace

21   concerns that are reported to the company?

22       A.    Yes.

23       Q.    Okay.  And how long have you been at Shell now?

24       A.    Two and a half years.

25       Q.    Okay.  During those two and a half years, is

Kelly Rogers
January 6, 2017

9

1    Ms. Noel the only employee you're aware of who has raised

2    concerns about her workplace environment?

3         A.    No.

4         Q.    All right.  With respect to each person who has

5    raised concerns, do you do a similar task for those

6    folks, in other words, take the relevant e-mails that

7    relates to those concerns, management's response, and

8    summarize them?

9              MS. MOXLEY:  Objection, vague.

10        Q.    (BY MR. AHMAD)  You can answer.

11        A.    Could you rephrase the question?

12        Q.    Sure.  When you get a report of a concern

13   raised by an employee, do you engage in a similar task of

14   summarizing the relevant e-mails with respect to those

15   concerns and management's response for each concern

16   that's raised?

17             MS. MOXLEY:  Objection, vague.

18        A.    I would say in a case that has the sheer number

19   of e-mails, I would do the same.  Not every case has the

20   same sheer number of e-mails from different sources.

21        Q.    (BY MR. AHMAD)  Okay.  How did Ms. Snider ask

22   you to put together the summary document?

23        A.    She provided me with a template that had been

24   done by another HR account manager in the past for a

25   different case.

Kelly Rogers
January 6, 2017

10

```
 1      Q.    How did she provide you that template?  Did she
 2   e-mail it to you, do you recall?
 3      A.    I believe via e-mail.
 4      Q.    Okay.
 5      A.    But may also have been hard copy.
 6      Q.    Okay.  And then how did she actually make that
 7   request of you?  Was that done in a face-to-face
 8   conversation or was that done via e-mail or telephone?
 9      A.    Face to face.
10      Q.    Okay.  And tell me about that discussion.
11      A.    From what I recall, Alyssa told me that she had
12   a complicated employee relations issue that she was
13   working on and that she needed some help synthesizing all
14   the documents that she had been able to compile, so she
15   asked me to take a look at -- she forwarded me all the
16   things that she had gotten at that point and asked me to
17   take a look at them and synthesize the information and to
18   facilitate that.  She gave me the template and said that
19   "This may be an easy way to kind of organize it."
20      Q.    How long was that meeting?
21      A.    Five minutes.
22      Q.    Okay.  Did you know anything about Ms. Noel's
23   situation before that meeting?
24      A.    No.
25      Q.    When was the meeting?
```

Kelly Rogers
January 6, 2017

11

1       A.    I can't say for certain, but I believe early

2   December 2014.

3       Q.    Okay.  How do you recall that?

4       A.    Because I know that she told me that it wasn't

5   super urgent, but she wanted it by the end of the year,

6   and so I decided to focus on it over the holidays when I

7   was working from home because I felt it was something

8   that I could do in isolation without a lot of input.

9       Q.    Okay.  All right.  And so the concerns that

10  Ms. Noel had raised about her workplace environment, what

11  were those concerns?

12             MS. MOXLEY:  Objection, vague, and

13  objection, mischaracterizes the witness' testimony.

14      A.    Can you rephrase the question?

15      Q.    (BY MR. AHMAD)  Sure.  The concerns that

16  Ms. Noel had raised that you were going to look at the

17  e-mails and sort of summarize, what were those concerns

18  that she had raised?

19             MS. MOXLEY:  Objection, vague; objection,

20  mischaracterizes the witness' testimony.

21      A.    Could you break down the question?  Do you want

22  a specific?  I just don't understand.  I'm sorry.

23      Q.    (BY MR. AHMAD)  You don't understand -- okay.

24  I think I can break that down for you.  Ms. Snider asked

25  you to review a large number of e-mails relating to,

Kelly Rogers
January 6, 2017

12

```
 1    somewhat related to concerns that Ms. Noel had raised
 2    about her workplace environment, right?
 3         A.    Yes.
 4         Q.    What concerns were those that Ms. Noel raised?
 5         A.    I would say that she didn't necessarily ask
 6    me -- can you repeat your question?  I'm sorry.
 7         Q.    No, that's okay.  And that's a good point.  If
 8    you ever do not understand any of my questions, let me
 9    know, okay?  And we'll -- we can work through it like
10    we're doing now.  All right?
11         A.    (Witness nods head.)
12         Q.    What do you recall were the concerns that
13    Ms. Noel raised about her workplace environment, in going
14    through the documents?
15         A.    I remember that one of the key concerns she
16    raised was bullying and discrimination.
17         Q.    Bullying by whom, do you recall?
18         A.    Management, but I don't recall specifics.
19         Q.    Okay.  And discrimination based on what?
20         A.    Gender.
21         Q.    She felt that she was being bullied by male
22    co-workers and male management, is that fair?
23         A.    I don't think she was that specific.  From what
24    I recall, the concern was more general bullying,
25    potentially motivated by discrimination.
```

Kelly Rogers
January 6, 2017

13

1    Q.   Okay.  She didn't allege that any female

2  managers or female workers were bullying her, right?

3    A.   I don't recall who she specifically alleged was

4  bullying her.

5    Q.   Okay.  Do you recall the names of any

6  individual that Ms. Noel alleges bullied her in the

7  workplace?

8    A.   Not specifically.  If you had a document, it's

9  been two years.

10    Q.   Well, I thought you reviewed your summary

11  yesterday.

12    A.   I did not go through every page and re-read it.

13  I just kind of looked at the top sheet and read the --

14    Q.   Sure.  Why did you review those documents to

15  prepare?

16           MS. MOXLEY:  Objection.  I think you're

17  getting into attorney/client.  I'm going to instruct the

18  witness not to answer.

19    Q.   (BY MR. AHMAD)  The documents that you

20  reviewed, were those given to you by somebody else to

21  review for your deposition?  In other words, you didn't

22  just go out and find documents to review yourself, right?

23    A.   No.

24    Q.   Okay.  But the documents that you reviewed,

25  they did help to refresh your memory, right, at least in

Kelly Rogers
January 6, 2017

14

1    some respects?

2         A.    To some extent.

3         Q.    Okay.  All right.  So my question is -- and if

4    you don't recall, you don't recall.  Just say "I don't

5    recall the name of any individual."  But what I'm

6    wondering is:  In looking at your summary and Ms. Noel's

7    complaint and affidavit, do you recall the name of any

8    individual whom Ms. Noel says bullied her in the

9    workplace?

10        A.    I can guess, but I cannot say definitively.

11        Q.    Okay.  Go ahead and guess.

12        A.    Debo comes to mind.  I don't remember what his

13   role specifically was in the case.

14        Q.    Okay.  All right.  Any other names that come to

15   mind?

16        A.    Jerry Jackson.

17        Q.    Any other names?

18        A.    Gouri, G-o-u-r-i.

19        Q.    Any others?

20        A.    No.

21        Q.    Who is Debo?

22        A.    I know he is a Nigerian Shell employee that

23   Ms. Noel -- I don't know if she reported to him or worked

24   with him while in Nigeria, but I know he was somehow

25   involved with Ms. Noel in Nigeria.

Kelly Rogers
January 6, 2017

15

```
 1      Q.    Okay.  And he works in Nigeria, as far as you
 2  know?
 3      A.    At the time, he did.  I don't know about now.
 4      Q.    Okay.  Was Debo Ms. Noel's direct supervisor,
 5  do you know?
 6      A.    I don't recall.
 7      Q.    All right.  And who is Gouri?
 8      A.    Gouri was Ms. Noel's direct supervisor when she
 9  came back to Houston.
10      Q.    Okay.  And he was her direct supervisor at the
11  time you were putting together this summary document for
12  Ms. Snider, right?
13      A.    Yes.
14      Q.    All right.  Do you know why Ms. Noel was
15  working in Nigeria?
16      A.    She was on an expatriate assignment.
17      Q.    Do you know how she received that assignment?
18      A.    I believe she applied through MOR.
19      Q.    What's MOR?
20      A.    Managed open resourcing.  It's our internal job
21  posting system.
22      Q.    Managed open resourcing?
23      A.    Uh-huh.
24      Q.    And what's on this managed open resourcing
25  system?
```

Kelly Rogers
January 6, 2017

16

1      A.      Internal job postings.

2      Q.      And so an employee looking for an available job

3   can go to this managed open resourcing system and see

4   what jobs are posted there?

5      A.      Yeah.

6      Q.      And they can do that anytime?

7      A.      At the time of this situation, we posted jobs

8   on managed open resourcing system three times a year, but

9   the system has changed.

10      Q.      How so?  How has it changed?

11      A.      Most jobs don't need to be posted during a

12   specific time of year anymore.

13      Q.      Okay.

14      A.      There are exceptions, of course.

15      Q.      Do you know how long Ms. Noel was on the

16   assignment in Nigeria?

17      A.      I don't recall.

18      Q.      Do you know how long Ms. Noel worked for Shell?

19      A.      I don't recall.

20      Q.      You don't recall when she started with Shell?

21      A.      No.  I do recall that she had at least one

22   other role in the U.S. before she went to Nigeria,

23   though.

24      Q.      Okay.  And she does not work for Shell any

25   longer, right?

Kelly Rogers
January 6, 2017

17

```
 1      A.    That's correct.

 2      Q.    Do you know why this Ms. Noel was terminated

 3  from Shell?

 4      A.    No, not specifically.

 5      Q.    What do you mean by "not specifically"?

 6      A.    I wasn't involved in the conversations to, you

 7  know, determine Ms. Noel's employment, so I can't say for

 8  sure what the exact reason was.

 9      Q.    Okay.  What do you know?  What were you told

10  about it?

11      A.    What was I told about?  Not much.

12      Q.    Okay.  Well, the little that you were told,

13  tell me what that is that you were told.

14      A.    I knew that she was leaving Shell employment in

15  the Q2 2015 time frame, but not the specific reasons why

16  or how that was being done or any specifics.

17      Q.    Who told you that Ms. Noel was leaving?

18      A.    I believe Ms. Snider.

19      Q.    And she didn't give you a reason for why?

20      A.    Not specifically.

21      Q.    Generally?

22      A.    She knew that I had seen all of the documents

23  and made a recommendation as part of the documents, so,

24  no, she did not say, specifically, because she knew that

25  I had some awareness of the case and likely would not be
```

1    surprised by hearing this.

2         Q.    And so when you heard that Ms. Noel was no

3    longer at Shell you weren't surprised?

4         A.    No.

5         Q.    Because you had recommended that she be

6    terminated?

7         A.    Yes.

8         Q.    And that recommendation was followed?

9               MS. MOXLEY:   Objection, mischaracterizes

10   the witness' testimony.

11              MR. AHMAD:   I'm asking.

12        Q.    (BY MR. AHMAD)  So was that recommendation

13   followed?

14        A.    Ultimately, yes, but I don't believe, by any

15   means, that the reason was because I recommended it.

16        Q.    Why do you say that?  I thought you just told

17   me that Ms. Snider didn't tell you the specific reason,

18   and she didn't do that because you knew about Ms. Noel's

19   situation and that you recommended termination.

20        A.    That's correct.

21        Q.    Okay.  So Ms. Snider didn't give you any other

22   reason for why Ms. Noel was terminated, right?

23        A.    That's correct.

24        Q.    Okay.

25        A.    But I feel personally confident that it's not

Kelly Rogers
January 6, 2017

1    because I recommended it.

2         Q.    Why do you say that?

3         A.    Just because of the nature of my role on the

4    team and also the nature of my role in the case.

5         Q.    What do you mean "in the case"?

6         A.    So, fundamentally, I was asked just to

7    synthesize documents and put them together in a logical

8    format; however, I -- by no means, did I -- you know, I

9    was not out there investigating her concerns, I was not

10   interviewing witnesses, and I don't have the authority

11   to make any decisions on anyone's employment in a vacuum.

12        Q.    What do you mean "in a vacuum"?

13        A.    So, of course, anyone can offer a

14   recommendation, but the -- as an HR graduate on the team,

15   you would need a higher level of authority within the

16   organization.

17        Q.    Oh, sure.  No, I understand that.  You did not

18   make the final determination.  Somebody had to approve

19   your recommendation, is that what you're trying to say?

20        A.    Yes.

21        Q.    Okay.  No, I understand that.  Who above you

22   would have to approve your recommendation?

23        A.    David Williams.

24        Q.    Did you ever speak to Mr. Williams about

25   Ms. Noel?

Kelly Rogers
January 6, 2017

20

```
 1      A.    Yes.

 2      Q.    Okay.  And what did y'all talk about?

 3      A.    He asked me -- I believe he asked me

 4  clarification questions based on the document I produced.

 5      Q.    The summary document?

 6      A.    Yes.

 7      Q.    Okay.  Do you recall what those questions were?

 8      A.    Not specifically.

 9      Q.    Did you all talk about your recommendation that

10  Ms. Noel should be terminated?

11      A.    I don't recall.

12      Q.    Did you speak to Ms. Snider about your

13  recommendation?

14      A.    Yes.

15      Q.    All right.  And what did y'all talk about in

16  that regard?

17      A.    I believe we spoke on kind of my take on what I

18  had read and what made me -- what led me to recommend

19  termination.

20      Q.    Okay.  And what was that that led you to

21  recommend termination?

22      A.    I think that the number of cases of -- a number

23  of examples that there were that I felt showed Ms. Noel

24  not taking personal responsibility for her, her part in

25  some of the events that happened over the course of her
```

Kelly Rogers
January 6, 2017

1    employment and the clear damage to relationships that had

2    been made.  Considering how relationship-based Shell is

3    as a company, I, personally, did not feel that Ms. Noel

4    would be successful in the organization.

5        Q.    You made that recommendation without ever

6    speaking to Ms. Noel, right?

7        A.    Yes.

8        Q.    Okay.  And you made that recommendation without

9    speaking to anybody other than Ms. Snider, right?

10       A.    That's correct.

11       Q.    Okay.  Ms. Noel was repatriated to the

12   United States because she raised concerns about her

13   workplace environment, right?

14                 MS. MOXLEY:  Objection, no showing of

15   personal knowledge.

16       A.    I wasn't involved in her repatriation in any

17   way, so I don't know.

18       Q.    (BY MR. AHMAD)  Well, you were told that

19   Ms. Noel was being repatriated because of the concern she

20   raised about the workplace environment, right?

21       A.    No.

22       Q.    You were never told that?

23       A.    No.

24       Q.    From an HR perspective, does that concern you,

25   hearing that somebody is repatriated because they raised

Raska Reporting
(832) 998-0015

Kelly Rogers
January 6, 2017

22

1    concerns about their workplace environment?

2         A.    Yes.

3         Q.    Why does that concern you?

4         A.    Because retaliation is never acceptable in the

5    workplace, and repatriation can be seen as retaliation.

6         Q.    Is there an anti-retaliation policy that Shell

7    has?

8         A.    Yes.

9         Q.    All right.  Did Human Resources ever

10   investigate whether Ms. Noel's repatriation was

11   retaliation?

12        A.    I believe that Alyssa investigated Ms. Noel's

13   concerns.

14               MR. AHMAD:  I'm going to object as

15   nonresponsive.

16        Q.    (BY MR. AHMAD)  I'm talking about the specific

17   issue of Ms. Noel's repatriation from Nigeria to the

18   United States.  Do you know one way or the other whether

19   Human Resources investigated whether that repatriation

20   was retaliation?

21        A.    It's my understanding that Alyssa investigated

22   all of Ms. Noel's concerns.

23        Q.    How do you know that?

24        A.    Just based on my knowledge of Alyssa, and I see

25   her as very detail-oriented.

Kelly Rogers
January 6, 2017

23

```
 1      Q.    Okay.

 2      A.    I would be surprised.

 3      Q.    So it's not --

 4      A.    It's not based on knowledge.  It's just based

 5  on what I had seen in the past --

 6      Q.    Okay.

 7      A.    -- from Alyssa.

 8      Q.    All right.

 9            (Exhibit No. 1 marked for identification.)

10      Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, you've

11  been handed Exhibit 1 to your deposition.  Do you

12  recognize that document?

13      A.    Yes.

14      Q.    All right.  What is Exhibit 1?

15      A.    This is the e-mail that I sent to Alyssa after

16  I had completed the discipline summary to let her know

17  that I had completed it and that I put it in the

18  SharePoint.

19      Q.    Why do you call it a discipline summary?

20      A.    Because that's what it was called on the

21  template that Alyssa provided me.

22      Q.    Were you asked to make a recommendation about

23  termination with respect to Ms. Noel or did you do that

24  completely on your own?

25      A.    I was not asked to do so.  The reason I did it
```

Kelly Rogers
January 6, 2017

24

```
1   was because it was on the template that Alyssa provided
2   me.
3        Q.    Okay.  Did you know one way or the other
4   whether anyone else at Shell had requested that Ms. Noel
5   be terminated at the time you were putting together this
6   document?
7              MS. MOXLEY:  Objection, vague.
8        A.    Can you rephrase your question?
9        Q.    (BY MR. AHMAD)  Do you know whether anybody
10  else at Shell had requested that Ms. Noel be terminated
11  at the time you were putting together the discipline
12  summary?
13             MS. MOXLEY:  Objection, vague.
14       A.    Could you rephrase again?  I'm sorry.
15       Q.    (BY MR. AHMAD)  When did you complete the
16  discipline summary?
17       A.    December 31st, 2014.
18       Q.    Okay.  And that's reflected on Exhibit 1?
19       A.    Yes.
20       Q.    All right.  Do you know whether in that time
21  frame, December of 2014, or before, do you know if at any
22  time before you completed the discipline summary whether
23  anyone at Shell had recommended that Ms. Noel's
24  employment be terminated?
25       A.    No.
```

Kelly Rogers
January 6, 2017

25

1      Q.    Okay.  So you were never told that?

2      A.    No.

3      Q.    Okay.  And so you don't know who recommended

4   that Ms. Noel's employment be terminated?

5      A.    I recommended in this document.  I do not

6   know --

7      Q.    Before you made the recommendation, you don't

8   know who else recommended that Ms. Noel or requested that

9   Ms. Noel be terminated?

10     A.    No.

11     Q.    Okay.  And you weren't requesting that Ms. Noel

12  be terminated, you were recommending that she be

13  terminated?

14     A.    Yes.

15     Q.    Okay.  If an employee believes that they are

16  being discriminated against, are they supposed to raise

17  that with the company?

18     A.    Yes.

19     Q.    Are they obligated to raise it?

20     A.    No.

21     Q.    Okay.  So they may just -- under Shell's

22  policy, they are allowed to just sit quiet, even if they

23  believe they are being discriminated against?

24     A.    It is difficult to mandate someone to do

25  something like that.  Our policy is to encourage people

Kelly Rogers
January 6, 2017

1    to feel comfortable to do that, but you can't say, "If

2    you feel discriminated against, you have to raise it."

3         Q.    Okay.  Well, discrimination is illegal, right?

4         A.    Yes.

5         Q.    And so if somebody feels like they are being

6    discriminated against, they feel like they are being

7    treated unlawfully, right?

8         A.    Yes.

9         Q.    Okay.  And so you don't think that Shell can

10   mandate if somebody sees illegal conduct going on in the

11   workplace that they report that?

12        A.    There is a difference -- I believe that your

13   original question asked me if the person felt that they

14   were being discriminated against that they had to raise

15   it.

16        Q.    Yes, ma'am.

17        A.    And I don't believe that it is possible to have

18   a policy that states that; however, of course, it would

19   be our expectation if someone else were to witness

20   examples of discrimination, that they would raise it.

21        Q.    Okay.  You mentioned that you encourage

22   employees to raise allegations of discrimination and hope

23   that they feel comfortable doing that.  Did I hear you

24   correctly?

25        A.    Yes.

Kelly Rogers
January 6, 2017

27

1     Q.     How is it that Shell attempts to make employees

2   feel comfortable in raising allegations of

3   discrimination?

4     A.     We have an ethics, anonymous ethics and

5   compliance hotline that you can call and anonymously

6   report concerns.

7     Q.     Okay.  How else?

8     A.     Of course, if you raise a concern directly to

9   HR unanonymously we will investigate the concern.

10    Q.     Okay.  And how else does Shell try to make

11  employees feel comfortable raising allegations of

12  discrimination?

13    A.     We have various policies against discrimination

14  and retaliation that -- and, obviously, we have a Code of

15  Conduct.

16    Q.     All right.  Was Ms. Noel bullied in the

17  workplace or do you know?

18    A.     I can't say for certain.  I wasn't there, but

19  my impression from reading the documents is that we

20  didn't have enough evidence to say yes.

21    Q.     How did you get that impression?

22    A.     Just in the totality of the evidence.

23    Q.     What evidence are you referring to?

24    A.     The e-mails.

25    Q.     Okay.  Was Ms. Noel discriminated against in

Kelly Rogers
January 6, 2017

28

1   the workplace?  Was she treated differently?

2        A.    Again, I can't say for certain yes or no, but

3   I, personally, don't believe so, based on what I've seen.

4        Q.    Okay.  But you're not -- that's not an official

5   Shell HR position from you, right?

6        A.    I mean, I wasn't there.  I can't say

7   definitively yes or no.

8        Q.    Do you know whether or not her allegations of

9   discrimination and bullying and retaliation were

10  investigated?  Do you know definitively one way or the

11  other?

12       A.    I know Alyssa Snider investigated Ms. Noel's

13  concerns.  I can't say, yes, she investigated this

14  concern, no, she investigated that concern; but I know

15  she did investigate concerns.

16       Q.    Okay.  And you just don't know what the result

17  of the investigation is?

18       A.    I did know that Ms. Noel was terminated at some

19  point, her employment was terminated at some point.  I

20  don't know if that was a direct result of the

21  investigation or of something else.

22       Q.    Okay.  Because you didn't complete the

23  investigation?

24       A.    No.

25       Q.    One of your jobs is to investigate allegations

Kelly Rogers
January 6, 2017

29

1    of discrimination, bullying, retaliation, right?

2        A.    Yes.

3        Q.    Why did you not investigate Ms. Noel's

4    allegations that she had raised?

5        A.    Typically, in HR, as an HR account manager, we

6    have a certain scope of employees that are our clients

7    that we manage their concerns, should they raise any.

8    At, you know, this time, I did not -- I was not the HR

9    account manager responsible for Ms. Noel's organization.

10   That would have been Alyssa; therefore, Alyssa

11   investigated the concerns.

12              In late 2014, I was HR analyst for the PTP

13   organization, which, more or less, is backup support,

14   project-based work, not direct client accountability.

15       Q.    Do you know when Ms. Snider investigated

16   Ms. Noel's allegations?

17       A.    Q1 2015.

18       Q.    Do you know when Ms. Noel raised these

19   allegations?

20       A.    Raised allegations in the U.S.?

21       Q.    At any time.

22       A.    I do know she raised concerns of bullying while

23   in Nigeria.  That was in the documents that I reviewed as

24   part of the summary.

25       Q.    Okay.

Kelly Rogers
January 6, 2017

30

1      A.    And I did know that she submitted the 15-page

2   affidavit.  I don't remember exactly when that was.

3      Q.    The allegations that Ms. Noel raised while she

4   was in Nigeria, do you know if Ms. Snider investigated

5   those allegations or would somebody else have done that?

6      A.    No, she did not.

7      Q.    Okay.  Do you know who did?

8      A.    The HR account manager in Nigeria.  I don't

9   remember the name.

10      Q.    Okay.  And do you know what the result of that

11   investigation was?

12      A.    I believe that they did not find evidence to

13   back up Ms. Noel's claim.

14      Q.    How do you know that?

15      A.    By reading the e-mails that I received.

16      Q.    Did you speak to the HR staff member who

17   investigated those allegations?

18      A.    No.

19      Q.    Okay.  When you investigate allegations of

20   discrimination and retaliation, how do you go about doing

21   that?

22      A.    There is no standard process; however,

23   typically, you interview the person that raised the

24   concerns, you would interview all of the key parties that

25   were involved in the concerns and you review any

Kelly Rogers
January 6, 2017

31

1  documents that -- documentation that you are able to have

2  that relate to the concerns.

3      Q.    Who do you go about deciding or how do you go

4  about deciding who to interview as part of the workplace

5  investigation?

6      A.    Typically, you obviously would also interview

7  the person that came forward with the concern, unless

8  it's anonymous and you don't know who that person is.

9      Q.    Okay.

10     A.    And if they, you know, allege that a specific

11 person was involved, you would, you know, typically

12 involve them, because it's important to hear all sides of

13 the story.  And then any, anyone else that through the

14 course of your conversation seems to have had a

15 significant role, or typically I would ask the person who

16 raised the concern if they -- if there is anyone, in

17 particular, that they think I should speak to.

18     Q.    Do you typically take notes when you interview

19 folks as part of an investigation?

20     A.    Yes.

21     Q.    Why?

22     A.    Just to be able to reference the conversation

23 later on and also so that we have, you know, a record.

24     Q.    When you were putting together the discipline

25 summary for Ms. Snider, you didn't review any sort of

Kelly Rogers
January 6, 2017

32

1   interview notes from any investigation into Ms. Noel's

2   investigation, right?

3       A.    I don't remember, specifically.  I do remember

4   that there was some challenge on getting documents from

5   Nigeria.

6       Q.    Do you recall when you received the

7   documentation from Nigeria?

8       A.    I believe there was some documents in the

9   e-mails that Alyssa forwarded to me, and I believe there

10  were some additional documents that were sent probably in

11  the January 2015 time frame that are referenced in this

12  e-mail, when we hear back from Nigeria, I will add in

13  those documents.  I believe we did eventually hear back

14  from them.  I'm not sure exactly what they were able to

15  provide, though.

16      Q.    All right.

17              THE WITNESS:  Could we take a quick break?

18              MR. AHMAD:  Sure.  That's fine.

19              (Brief recess from 10:38 a.m. to

20  10:44 a.m.)

21              (Exhibit No. 2 marked for identification.)

22      Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, are you

23  ready to proceed with your deposition?

24      A.    Yes.

25      Q.    Okay.  You've been handed Exhibit 2 to your

Kelly Rogers
January 6, 2017

1    deposition.

2        A.    Uh-huh.

3        Q.    Do you recognize that document?

4        A.    Yes.

5        Q.    Okay.  What is Exhibit 2?

6        A.    It's a string of e-mails.  I've only had a

7    chance to look at the first one, but this one is an

8    e-mail from Gouri to Alyssa detailing some of his

9    concerns about Cornelia's behaviors.

10       Q.    Okay.  And do you know why Ms. Snider forwarded

11   this to you on Sunday morning, December 21st?

12       A.    So that I could include it as part of the

13   discipline summary.

14       Q.    Okay.  And why were you to include this as part

15   of the discipline summary, do you know?

16       A.    Because it includes a lot of information about

17   what had been going on since Cornelia had been

18   repatriated to Houston.

19       Q.    Okay.

20       A.    Ms. Snider forwarded me any document that she

21   had that was at all relevant to Cornelia.

22       Q.    What do you mean by that, "relevant to

23   Cornelia"?  Do you mean relevant to some form of

24   discipline that she had incurred?

25       A.    No.  What I mean by "relevant" is just involved

Kelly Rogers
January 6, 2017

34

1   Cornelia at all.  Any e-mails that she had sent to

2   management, any e-mails Alyssa had received from

3   management, she sent it all to me.

4       Q.    Okay.  But you're not talking about just

5   general work e-mails, you're talking about any e-mails

6   that related to her concerns and/or management's

7   response?

8       A.    That Alyssa had received.

9       Q.    Okay.  How do you know how Ms. Snider decided

10  to pick which document she forwarded to you?

11      A.    It is my understanding that she forwarded all

12  the documents to me that she had received.

13      Q.    Okay.  So it's your understanding that

14  Ms. Snider didn't hold anything back that she received?

15      A.    Yes.

16      Q.    Okay.

17      A.    Of course, I can't say for certain, but --

18      Q.    Right.

19      A.    -- that's what she told me.

20      Q.    Okay.  Do you know what categories of documents

21  she requested?

22      A.    Not specifically.

23      Q.    Okay.  All right.  So take a look at Exhibit 2.

24  The last e-mail in the chain before it's forwarded to you

25  is an e-mail from Gouri to Ms. Snider and Mr. Peart?

Kelly Rogers
January 6, 2017

35

1    A.    Yes.

2    Q.    All right.  And he's got a couple of bullet

3  points with, it looks like, five sub bullet points, do

4  you see that?

5    A.    Yes.

6    Q.    All right.  On the second bullet point he

7  states, toward the bottom, "We do not have work for

8  Cornelia in her line of specialty (hardware) that is of

9  JG2 level."  Did I read that correctly?

10   A.    Yes.

11   Q.    Do you know if that's a correct statement?

12   A.    No.

13   Q.    Okay.  You don't know one way or the other?

14   A.    No.

15   Q.    Okay.

16   A.    HR would rely on the business for information

17  like that.

18   Q.    Okay.  Did you read this e-mail at the time you

19  received it?

20   A.    Yes.

21   Q.    Or at some point, you reviewed it before --

22   A.    Prior to -- between December 21st and

23  December 31st, yes.

24   Q.    Right.  I didn't mean to suggest that you were

25  up at 6:51 a.m. reading it as it came in.

Kelly Rogers
January 6, 2017

36

 1      A.    No.

 2      Q.    Okay.  In the e-mail that's -- the e-mail to

 3  Ms. Snider was December 14th, 2014, right?

 4      A.    Yes.

 5      Q.    In the first bullet point, Gouri states that

 6  there are behavioral issues with Cornelia that he

 7  believes are not redeemable.  Did I read that correctly?

 8      A.    Yes.

 9      Q.    Do you know what he meant by that?  Or did you

10  ask him at all about that statement?

11      A.    I don't recall ever speaking directly with

12  Gouri on this case.

13      Q.    Okay.  All right.  Do you know what he meant by

14  that statement?

15      A.    I can make my own interpretation, but I can't

16  say for certain what he meant.

17      Q.    Okay.  Why didn't you speak to Gouri?

18      A.    I was not investigating the investigator in

19  this case.  I was asked to simply read through the

20  e-mails, summarize and compile them.  If I was the

21  investigator, I would have spoken with Gouri and

22  interviewed him, I suppose.

23      Q.    Did you assist with the investigation into

24  Ms. Noel's concerns?

25      A.    I was present in two, at least two meetings

Kelly Rogers
January 6, 2017

37

1    where my role was to take notes.

2        Q.    And did you do that?

3        A.    Yes.

4        Q.    Okay.  When was that?  When were those

5    meetings?

6        A.    There was one meeting which I believe was

7    in late 2014 that I was present at and one meeting in

8    Q1 2015 that I was present at.  There may have been more,

9    but those are the two that I can distinctly recall.

10       Q.    And who all was present for those meetings?

11       A.    The first meeting was myself, Alyssa, Gouri and

12   Doug Peart.

13       Q.    Okay.  How about the second one?

14       A.    Myself, Alyssa, Jamie Allen, Debo, who happened

15   to be in Houston, so he was in person, and then we

16   teleconferenced in Jerry Jackson from Nigeria.

17       Q.    All right.  And when was that?

18       A.    Q1 2015.  I can't recall specifics.

19       Q.    Was it after Ms. Noel had been let go?

20       A.    No.

21       Q.    All right.  Okay.  And tell me, tell me what

22   you recall from that meeting, the second meeting.

23       A.    That was a meeting as part of Alyssa's

24   investigation into Cornelia's concerns, and we -- she and

25   Jamie Allen were trying to get more information about

Kelly Rogers
January 6, 2017

38

1    what happened in Nigeria.

2         Q.    Ms. Snider and Ms. Allen were?

3         A.    Yes.

4         Q.    And what did you learn?

5         A.    I don't recall specifics.

6         Q.    Generally, what do you recall from the meeting?

7         A.    I recall that Alyssa and Jamie had some

8    specific questions for Jerry and Debo about things along

9    the lines of, you know, cell phone policy in Nigeria and

10   car policy in Nigeria, because Ms. Noel had raised those

11   as specific concerns.

12        Q.    What information did they get about that?

13        A.    I believe that there was a change in the car

14   policy in Nigeria that Jerry described.  I can't remember

15   exactly what that change was.

16        Q.    Okay.  Anything else you recall?

17        A.    No.

18        Q.    How long was the meeting?

19        A.    An hour and a half.

20        Q.    And the only thing you recall was that there

21   was a change in the car policy?

22        A.    It was two years ago.  Yes.

23        Q.    Did you review your notes from that meeting in

24   preparation for your testimony?

25        A.    No.

Kelly Rogers
January 6, 2017

39

1    Q.    Have you seen your notes from the meeting?

2    A.    Not in two years.

3    Q.    Do you know where they are?

4    A.    I believe I would have submitted them as part

5    of this.  I submitted everything that I had.

6    Q.    Okay.  And you did that two years ago?

7    A.    Yes.

8    Q.    You had an idea that if Ms. Noel were

9    terminated that she would likely file a lawsuit, right?

10   A.    I could guess that that was a likely outcome.

11   Q.    All right?

12   A.    And I did as part of the risks that I mentioned

13   in the summary.

14   Q.    And why did you view that as likely?

15   A.    Just based on the number of concerns that were

16   raised by Ms. Noel and some of the specific language used

17   in the, in the e-mails.

18   Q.    Such as what?

19   A.    I can't think of any examples off the top of my

20   head.  That's just the impression that I got.

21   Q.    Okay.  So you, you fault Ms. Noel for raising a

22   number of issues?

23   A.    No.

24   Q.    Well, then why do you refer to the number of

25   allegations that she raised?

Kelly Rogers
January 6, 2017

40

1      A.    I think that the large number of allegations

2  increases the likelihood that she would pursue a claim.

3      Q.    Why do you believe that?

4      A.    Just because, you know, if I was in such a

5  situation and I felt that I had been wronged in so many

6  different ways, I would likely be more upset about it and

7  likely be more interested in going through a long and

8  painful process.

9      Q.    When you provided the discipline summary to

10  Ms. Snider, that's the transmittal e-mails, Exhibit 1?

11     A.    Uh-huh.

12     Q.    By the way, did you ever update or revise your

13  discipline summary, that you recall?

14     A.    I believe I added -- I believe we got

15  additional information from Nigeria, which I added.

16     Q.    Okay.  And when did you update the discipline

17  summary, do you know?

18     A.    I would guess January 2015.

19     Q.    I'm sorry.  I may have asked you this earlier,

20  but do you recall what Ms. Noel's specific issues were?

21  I know you talked earlier about how she was complaining

22  that she had been discriminated against and she had been

23  bullied.  Setting aside the labels that you put on it, do

24  you recall what her specific factual allegations were?

25     A.    No.

Kelly Rogers
January 6, 2017

41

1      Q.    Is there any document that would help you

2   refresh your memory as to what Ms. Noel's specific

3   factual allegations were?

4      A.    Her affidavit or the discipline summary.

5      Q.    Okay.

6              (Exhibit No. 3 marked for identification.)

7      Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, that is

8   Exhibit 3 to your deposition.

9              MR. AHMAD:  That's a document that was

10  used in the other, so I don't have an extra copy.

11             MS. MOXLEY:  Can I just -- I just want to

12  double-check the Bates numbers on it.  Well, the Bates

13  number is different from the one yesterday.

14             MR. AHMAD:  Oh, it is?  Okay.  What's the

15  Bates range on that?

16             MS. MOXLEY:  On the one you just handed

17  me?

18             MR. AHMAD:  Yeah.

19             MS. MOXLEY:  It's 2772 to 2783.

20             MR. AHMAD:  Do you know if it's different

21  from the other Bates range?

22             MS. MOXLEY:  Offhand, I don't know.

23             MR. AHMAD:  Okay.  What's the Bates range

24  on that one, on Exhibit 3?

25             MS. MOXLEY:  2772 to 2783.

Kelly Rogers
January 6, 2017

42

```
 1                    MR. AHMAD:  All right.  Well, let me just
 2     ask her a couple of questions about it.
 3          Q.     (BY MR. AHMAD)  All right.  Ms. Rogers, you've
 4     been handed Exhibit 3 to your deposition.  Do you
 5     recognize that document?
 6          A.     Yes.
 7          Q.     All right.  And what is Exhibit 3?
 8          A.     It's the discipline summary that I created for
 9     Alyssa.
10          Q.     And is that the original one, can you tell,
11     before it was updated at all?
12          A.     It says as of December 31st, so I would assume
13     yes.
14          Q.     All right.  All right.  So looking at the
15     discipline summary, does that refresh your memory as to
16     what Ms. Noel's specific factual allegations were with
17     respect to discrimination and bullying?
18          A.     Are you referring to her concerns from a
19     specific time period or just in general?
20          Q.     At all.
21          A.     It is not really helping.  It's a lot of quotes
22     and dates and -- but it's -- it doesn't clearly summarize
23     Cornelia's concerns.
24          Q.     Okay.  Why is that?
25          A.     Because the purpose of this document was to put
```

Kelly Rogers
January 6, 2017

43

1    into a logical time line of events kind of what had

2    happened and summarize what was said in the e-mails that

3    we were able to obtain, not necessarily to summarize

4    Ms. Noel's complaint.

5         Q.    Okay.  I thought that you told me earlier that

6    one of the purposes of the document was to summarize

7    Ms. Noel's concerns.

8         A.    I don't recall saying that.

9         Q.    Okay.  Was that one of the purposes of the

10   document?

11        A.    I don't believe so.

12        Q.    Why not?

13        A.    Because I was asked just to look at the e-mails

14   and summarize what was in the e-mails and put them in a

15   logical time line so that it was easier to understand.

16        Q.    Well, I thought you told me that the e-mails

17   you were looking at, some of which had to do with

18   Ms. Noel's concerns.

19        A.    That is true.

20        Q.    Okay.  So why did you not include

21   Ms. Noel's actual concerns in your summary?

22        A.    I may very well have, but from my quick glance

23   at the 12 pages, nothing is coming quickly.

24        Q.    Okay.  Well, take more time if you need then.

25   You don't have to do a quick review.

Kelly Rogers
January 6, 2017

44

```
 1       A.    I do have a clarification question.

 2       Q.    Sure.

 3       A.    Are you asking for specific examples of

 4  concerns relating to discrimination and bullying or

 5  specific examples of just Ms. Noel raising concerns about

 6  her work environment or both?

 7       Q.    Well, the concerns that Ms. Noel raised were

 8  concerns of bullying and discrimination, right?

 9       A.    Yes.

10       Q.    Okay.  Those concerns.

11       A.    Okay.  There is, in this document, a summary of

12  an e-mail sent from Ms. Noel in 2012 that says that she

13  feels that she's been treated differently from her peers

14  and gives several examples of how.

15       Q.    Okay.  What page are you on?

16       A.    Page 8 on the top box.

17       Q.    Okay.  So in that box you state that Ms. Noel

18  believes that she is being treated differently from her

19  peers at the same job grade?

20       A.    Yes.  And then the third box down, it says,

21  "Cornelia makes an allegation of bullying."

22       Q.    Where are you in the third box?

23       A.    In the first paragraph in the third box on the

24  same page.

25       Q.    Okay.
```

Kelly Rogers
January 6, 2017

45

1    A.    It says, "Cornelia disagrees with this

2  assessment and makes an allegation of bullying."

3    Q.    What is the assessment that Ms. Noel disagreed

4  with?

5    A.    I don't recall.  I would have to read the

6  e-mail.

7    Q.    Why did you not include that in the summary?

8  Don't you think that's pretty important to include?

9    A.    I don't know, specifically, why I didn't

10  include it.

11    Q.    Don't you think that that's something that

12  ought to have been included in the summary?

13    A.    Perhaps, in reflection, it should have been,

14  but it apparently did not occur to me at the time.

15    Q.    All right.  Any other specific allegations that

16  you see referenced?

17    A.    On the same page at the very bottom of the box,

18  at the very bottom, it says, "Cornelia has a meeting with

19  Kerri Frannea" and it says -- and it continues on to the

20  next page.  "She states that the system is every bit as

21  biased against females as it was in the past."

22    Q.    Okay.  Do you know what she meant by that?

23    A.    I believe that she is implying that the system

24  is biased against female engineers.

25    Q.    Is that true?

Kelly Rogers
January 6, 2017

46

1       A.    I can't say for certain.  I'm not an engineer.

2       Q.    Well, you are in HR.

3       A.    That's true.

4       Q.    One of your responsibilities is to find out if

5   the system is biased against females, is that fair?

6       A.    I don't personally believe it is, but I'm not

7   an engineer, so it's --

8       Q.    Sure.  But you don't know?

9       A.    I don't know, but I don't believe it is.

10      Q.    Okay.  Why don't you believe it?

11      A.    Based on what I've seen and conversations that

12  I've had.

13      Q.    But you didn't investigate that allegation,

14  right?

15      A.    I did not investigate this specific allegation,

16  no.

17      Q.    You would agree that that is a very serious

18  allegation that Ms. Noel is stating there, right?

19      A.    Yes.

20      Q.    Okay.  From an HR perspective, that allegation

21  should cause you some concern to hear that, right?

22      A.    Yes.

23      Q.    Okay.  Why didn't you take just a couple of

24  minutes and talk to Ms. Noel when you were seeing these

25  allegations?

Kelly Rogers
January 6, 2017

47

1       A.      Well, one thing to note is these allegations

2   were made in 2012, so I was only looking at this three

3   years later.

4       Q.      Okay.

5       A.      And, secondly, again, the intent of my role in

6   this was not to investigate.  It was just to summarize.

7       Q.      And recommend that Ms. Noel's employment be

8   terminated.

9       A.      I wasn't specifically asked to recommend

10  anything.

11      Q.      But you did.  You went ahead and took that

12  step.

13      A.      I did.

14      Q.      You didn't have to?

15      A.      I did not.

16      Q.      Okay.  But you chose to?

17      A.      Yes.

18      Q.      All right.  Without ever talking to Ms. Noel?

19      A.      Yes.

20      Q.      Do you believe that's fair to Ms. Noel?

21      A.      If I was the final decision maker, it would not

22  have been fair, but I knew that I was not, by any means,

23  the decision maker, and that I was simply making a

24  recommendation based on the evidence that I had seen,

25  which may not have been everything, it was just what I

Kelly Rogers
January 6, 2017

48

1    had access to.

2        Q.    Well, did you say that when you were

3    recommending termination, that, "Look, this is based on

4    incomplete information, don't take this recommendation

5    too seriously"?

6                MS. MOXLEY:   Objection, argumentative.

7        Q.    (BY MR. AHMAD)  Did you make that clear when

8    you were giving the recommendation?

9                MS. MOXLEY:   Objection, argumentative.

10       A.    I obviously did not say that in this specific

11   paragraph; however, as I said before, based on my role in

12   the team and in this case, I knew that my recommendation

13   is not -- they weren't going to act based on my

14   recommendation.  No way.  So I did not feel it necessary

15   to specifically state that in this document.

16       Q.    (BY MR. AHMAD)  So if you felt that they

17   weren't going to act on the recommendation, why give the

18   recommendation at all?

19       A.    Honestly, I -- it was on the template that

20   Alyssa provided me, both the recommendation and the

21   potential risks, so I filled it out.  That's what

22   prompted me to do it.

23       Q.    What is a progressive discipline policy?

24       A.    That phrase can mean a lot of things, but,

25   typically, it's moving from a less severe level of

Kelly Rogers
January 6, 2017

49

1   discipline, progressively, to a more severe level of

2   discipline over time.

3       Q.    The most severe form of discipline being

4   termination of employment, right?

5       A.    In this context, yes.

6       Q.    Okay.  And in Shell's progressive discipline

7   policy, you were supposed to take a series of steps

8   before an employee is ultimately terminated,

9   right?

10              MS. MOXLEY:  Objection, mischaracterizes

11  the witness' testimony.

12      Q.    (BY MR. AHMAD)  Right?

13              MS. MOXLEY:  Same objection.

14      A.    Can you repeat your question?

15      Q.    (BY MR. AHMAD)  Sure.  According to Shell's

16  progressive discipline policy, Shell is supposed to take

17  a series of progressive steps before an employee is

18  ultimately terminated, right?

19              MS. MOXLEY:  Objection, assumes facts and

20  mischaracterizes witness' testimony.

21      A.    We don't have a clear policy on how we have to

22  handle employee-relation situations in every case.

23              MR. AHMAD:  I'm going to object as

24  nonresponsive.

25      Q.    (BY MR. AHMAD)  I'm not talking about every

Kelly Rogers
January 6, 2017

50

```
1   single case or whether some situations, some warrant

2   going immediately to termination.  You would agree with

3   that, right?

4        A.   Yes.

5        Q.   Okay.  But when you don't have those

6   most-severe situations, Shell has a policy that utilizes

7   a series of steps before you get to termination, right?

8              MS. MOXLEY:  Objection, assumes facts.

9        A.   When you --

10             MR. AHMAD:  I'm not assuming anything.

11  I'm asking a Human Resources person, so --

12             MS. MOXLEY:  Well, you're assuming that

13  there is such a policy --

14             MR. AHMAD:  I'm asking.

15             MS. MOXLEY:  -- and we haven't established

16  that yet.  That wasn't the question you asked her.

17             MR. AHMAD:  Well, I'm asking.

18             MS. MOXLEY:  Well, if you want to ask her

19  if such a policy exists, then ask that question.

20             MR. AHMAD:  That is what I'm asking.

21             MS. MOXLEY:  Well, that wasn't the

22  question I heard.  Maybe I misheard it.

23             MR. AHMAD:  Okay.

24             MS. MOXLEY:  That wasn't the question I

25  heard.
```

Kelly Rogers
January 6, 2017

51

1          MR. AHMAD:  Okay.

2     Q.    (BY MR. AHMAD)  Go ahead and answer the

3  question.

4     A.    What, specifically, do you mean by "policy"?

5     Q.    What is a policy?

6     A.    So my question kind of comes from, when you say

7  policy, do you mean something that we're mandated to do

8  or is it just recommended guidelines?

9     Q.    You tell me.  You work for Shell in Human

10  Resources.  You tell me.  What are Shell's policies?  Are

11  they mandates?

12     A.    No.

13     Q.    Okay.  So employees can choose to follow the

14  policies or not?

15     A.    That's not what I meant by that.

16     Q.    Okay.  I didn't think so.  Okay.  So are

17  Shell's policies required to be followed?

18     A.    What I would say is that our policies are more

19  guidelines and that it's difficult to -- there is always

20  gray space in our policies because they can be kind of

21  generic.

22     Q.    Okay.

23     A.    That's kind of what I was getting at.  I

24  probably didn't explain that well.

25     Q.    Okay.  So policies are guidelines.  When it

Kelly Rogers
January 6, 2017

52

1  comes to the progressive discipline policy, we talked

2  about that before, that in some circumstances you don't

3  have to follow the policy, you can go immediately to

4  termination, right?

5      A.    That is correct.

6      Q.    Okay.  And so that's what you mean by

7  "guideline," right?

8      A.    Yes.

9      Q.    Okay.

10     A.    And I would say that, specifically, our -- I

11  believe when you say progressive discipline policy,

12  you're referring to our managing individual

13  under-performance guidelines.  We don't even call them a

14  policy.

15     Q.    You call it a guideline?

16     A.    Yes.

17     Q.    Okay.  Why did you not recommend that the

18  guideline be followed with respect to Ms. Noel?

19     A.    I state in my recommendation that -- or in

20  somewhere -- "While there has been no formal performance

21  improvement plan, I think we are able to make the

22  argument that she has received more than enough feedback

23  and chances to improve."

24     Q.    Where are you reading?

25     A.    On Exhibit 1, the middle paragraph, the last

Kelly Rogers
January 6, 2017

53

1   sentence.

2       Q.    What do you mean by "We can make the argument,"

3   or "We will be able to make the argument"?

4       A.    I felt confident that based on the totality of

5   evidence that it was clear that she had been given those

6   opportunities; therefore, I felt confident that we could

7   make that argument.

8       Q.    Make what argument?

9       A.    That she had been given these opportunities, so

10  while she had not been on a formal performance

11  improvement plan, she had been given multiple

12  opportunities to improve her performance, which is the

13  intent of a performance improvement plan.

14      Q.    What is a formal performance improvement plan?

15      A.    It's part of our managing individual

16  under-performance guidelines.  It's a document that is

17  made up by the employee's manager that states -- both

18  summarizes kind of the areas of under-performance that

19  need to be improved upon and also states specific actions

20  that the employee needs to take in order to demonstrate

21  that they are, you know, improving their performance and

22  can be competitive against their peers with deadlines.

23      Q.    And you abbreviate that "PIP," right?

24      A.    Yes.

25      Q.    Okay.  So when I refer to a PIP, you know what

Kelly Rogers
January 6, 2017

54

1    I'm referring to?

2         A.    Yes.

3         Q.    All right.  And what is supposed to be included

4    in a PIP under the guidelines?

5         A.    There is basic employee information at the top

6    of the document, then there is a section that describes

7    the under-performance as seen by the manager with

8    specific examples of the under-performance.  Then there

9    are the actions that they need to, the employee needs to

10   perform in order to demonstrate that they are improving

11   on their performance and can be competitive against their

12   peers, and each action needs to have a deadline

13   associated with that.  And then at the end of the

14   document it lists the resources that are available to the

15   employee during this review period and also how long the

16   review period is.

17        Q.    All that goes on a PIP?

18        A.    Yes.

19        Q.    How long are these PIP, typically?

20        A.    Several pages.

21        Q.    So it's supposed to be in writing?

22        A.    Yes.

23        Q.    All right.  Why?

24        A.    So that both management and the employee have

25   something to reference when they are having their regular

Kelly Rogers
January 6, 2017

55

1   review meetings over the performance -- over the

2   employee's performance, and also so that we can, you

3   know, record notes and have a working document.  So both

4   parties are seeing the same thing.

5       Q.    Got you.  So there is no dispute about what the

6   alleged performance deficiencies are, right?

7       A.    So what I've seen is the document says what the

8   manager sees as performance deficiencies.  That doesn't

9   necessarily mean that the employee agrees with that

10  assessment, but the document does state what it states.

11      Q.    I understand.

12            MR. AHMAD:  I'm going to object as

13  nonresponsive.

14      Q.    (BY MR. AHMAD)  My question was a little bit

15  different.

16      A.    Okay.

17      Q.    I understand your answer, but the reason that

18  it's in writing and there is specific examples is that,

19  like you said, the employee, management, HR, they are

20  looking at the exact same language, right?

21      A.    Yes.

22      Q.    So there is no dispute what the alleged

23  performance deficiencies are?

24      A.    Yes.

25      Q.    Okay.  And then there is another section you

Kelly Rogers
January 6, 2017

56

```
 1    said.  Did you call it required actions of the employee?

 2         A.    Yes.

 3         Q.    Okay.  And you said there is a deadline

 4    associated with that?

 5         A.    With each action.

 6         Q.    Okay.  Why is that?  Why is there a deadline

 7    associated with each action?

 8         A.    The purpose of the actions are that they are,

 9    you know, SMART goals.  I don't know if you've heard that

10    phrase before.

11         Q.    I have.

12         A.    So that we can kind of track the time of

13    completion.  Because, you know, if there is not a

14    deadline attached, people typically push it off.

15         Q.    How long is the deadline, typically, for an

16    action?

17         A.    So I would say the entire PIP review period

18    would, on average, be about three months.

19         Q.    90 days?

20         A.    So some of the actions may have specific

21    deadlines based on the nature of the work that the

22    employee does, but some of them will typically, the

23    deadline will be the completion of the review period.

24         Q.    Okay.  So some deadlines within the PIP will be

25    30, 45, 60 days, maybe immediate, and then other
```

Kelly Rogers
January 6, 2017

```
 1    deadlines will be the end of the PIP review period?

 2        A.    Yes.

 3        Q.    Okay.  At least that's your experience?

 4        A.    Yes.

 5        Q.    All right.  What involvement do you have in

 6    PIPs, just generally, as part of your job?

 7        A.    As an HR account manager?

 8        Q.    Yes.

 9        A.    Typically, I become involved when a manager

10    comes to HR with concerns about an employee, you know,

11    not performing compared to their peers.  This can be

12    through a multitude of ways, but that's when HR becomes

13    involved.

14        Q.    If a manager comes and says, "Hey, I've got a

15    problem with an employee"?

16        A.    And asks for advice, yes.

17        Q.    Okay.  And then where do you, from an HR

18    perspective, where do you take it from there?

19        A.    So I typically try to probe the manager for,

20    you know, what conversations have they had with the

21    employee, what are the, you know, examples of

22    under-performance that they have seen, you know, have

23    they documented in their mid-year, end-year review?

24    Basically get a sense of the situation.

25        Q.    Then what do you do?
```

Kelly Rogers
January 6, 2017

58

```
 1      A.    And then I advise the next steps.  You know, in

 2   conversation with the manager, we try to determine for

 3   that case what we think is most appropriate.

 4      Q.    And then what do you do?

 5      A.    Are you asking if, if the recommendation based

 6   on the -- is to start performance improvement plan?

 7      Q.    Yes.

 8      A.    Then I would ask the manager to draft up a

 9   draft performance improvement plan.  I would provide him

10   a template and kind of walk him through the expectation

11   that, you know, they are SMART goals and all of that.

12      Q.    What does "SMART" stand for?

13      A.    Specific, measurable, achievable, realistic and

14   time bound.

15      Q.    I'm sorry.  Specific --

16      A.    Measurable.

17      Q.    Measurable.

18      A.    I can't remember what I just said for A.

19      Q.    I bet the court reporter knows.

20            THE COURT REPORTER:  Achievable.

21      A.    Achievable.  Yes.  Realistic and time bound.

22      Q.    (BY MR. AHMAD)  I'm sorry.  Time bound?

23      A.    (Witness nods head.)

24      Q.    Okay.  That's what happens if y'all get

25   together and y'all decide that a PIP is an appropriate
```

Kelly Rogers
January 6, 2017

59

1    course of action.  What do you do if you determine that a

2    PIP is not the appropriate course of action?  What are

3    the alternative courses of action you've got?

4         A.    So I could advise that the manager, you know,

5    continue coaching the employee and documenting the

6    conversations that they have with the employee via

7    e-mail, mid-year, end-year reviews, et cetera, or if the

8    situation is extremely severe, we could pursue more

9    severe discipline.

10        Q.    Such as what?

11        A.    I've had cases in the past where it's more of

12   an ethics and compliance thing.  The manager comes to me

13   kind of in the vein of "This is my concern" and I feel

14   it's more of an ethics and compliance concern.

15        Q.    Okay.  And so that would warrant something more

16   along the lines, not of a PIP, but either some sort of

17   suspension --

18        A.    Verbal warning or written warning without the

19   document.

20        Q.    Got you.  Or you could suspend the employee?

21        A.    We typically never suspend employees.

22        Q.    As a disciplinary step?

23        A.    Except for in manufacturing, things along those

24   lines.

25        Q.    Okay.  But if it's a more serious issue, you'll

Kelly Rogers
January 6, 2017

60

1   either do documented verbal warning, written warning or

2   go ahead and terminate?

3      A.    Typically, yes, with staff employees.

4      Q.    Okay.  What do you mean by "staff employees"?

5      A.    In contrast with, you know, operators and

6   manufacturing.

7      Q.    Okay.  Ms. Noel was a staff employee?

8      A.    Yes.

9      Q.    Okay.  Got you.  And so you asked the manager

10  to -- if you decide that a PIP is appropriate, you ask

11  the manager to prepare a draft?

12     A.    Yes.

13     Q.    Okay.  That HR then reviews?

14     A.    Yes.

15     Q.    Okay.  And what are you reviewing it for?

16     A.    Quality.

17     Q.    All right.  And what goes into the quality of a

18  PIP?

19     A.    Typically, the first draft a manager provides

20  of a performance improvement plan has very vague goals

21  that would not be measurable, that we can't actually

22  determine whether or not the person has improved their

23  performance, and then I push back on them and tell them

24  to do better.

25     Q.    Okay.  Got you.  So it doesn't follow the SMART

Kelly Rogers
January 6, 2017

61

plan?

A.    Yes.

Q.    Okay.  Do you have any sense of how often or --
not how often, but what percentage of the time a PIP is
successful in getting the performance to come around to
an acceptable level?

A.    I would say, in my experience, about 30 percent
of the time.

Q.    Okay.  What happens in the other 70 percent, in
your experience?

A.    The performance does not improve.  And I have
had cases where the employee chooses to resign.  I've had
cases where the employee is terminated.  I've had cases
where the -- you know, in this recent oil price downturn,
at the same time that we are trying to address a concern,
the worker goes away, the project is canceled.  And in
that case, employees would be likely severed.

Q.    Okay.  Looking back at Exhibit 2 -- all right.
So before I ask you that, Exhibit 3 --

A.    Uh-huh.

Q.    -- is the discipline summary that you put
together?

A.    Yeah.

Q.    And you can just ballpark it for me, but can
you tell me roughly how long it took you to go through

Kelly Rogers
January 6, 2017

1    the documentation and put together Exhibit 3?

2        A.      Three days.

3        Q.      Three days straight, working nothing but that?

4        A.      The week of New Year's 2014 I worked from home,

5    I believe, three days, and this is the only thing I

6    worked on.

7        Q.      Okay.  And you're talking about a regular

8    eight-, nine-hour workday?

9        A.      Probably a little less than that.

10       Q.      Okay.

11       A.      But the entire workday, when I was working, I

12   was working on this.

13       Q.      So somewhere in the neighborhood of 20 to 24

14   hours to put together that, is that --

15       A.      Probably a good assessment?

16       Q.      Okay.  Is it fair to say that you looked at a

17   lot of documents --

18       A.      Yes.

19       Q.      -- in putting that together?  Can you list for

20   me -- you can't sit here and tell me, without looking at

21   the document, maybe you could, but can you tell me

22   without looking at the document everything you looked at?

23       A.      No.

24       Q.      If you looked through the document, could you

25   tell me everything you looked at?  Well, everything -- in

Kelly Rogers
January 6, 2017

63

1    other words, will everything that you looked at be

2    referenced in Exhibit 3 or is there some stuff that you

3    looked at that would not be somewhere identified in

4    Exhibit 3, or do you know?

5        A.    I believe that not everything is referenced.

6    There were some e-mails that I did not feel added

7    anything to the summary.

8        Q.    Okay.  All right.  So without telling me

9    everything that you looked at, specifically, tell me,

10   generally, what was your -- what was your process?  And

11   let me, let me put some context to it, as well.

12       A.    Okay.

13       Q.    I know I asked you before, but I'm not sure

14   what your answer was, so I'll ask you again.  When were

15   you asked to put together the discipline summary that's

16   Exhibit 3?

17       A.    Early 2000 -- or early December 2014.

18       Q.    Do you know why you didn't start working on it

19   until late December, almost the end of the year?

20       A.    Because Alyssa gave me a deadline of

21   December 31st, and I chose to do it when I was working

22   from home because I knew that I would have long periods

23   of time undisturbed.

24       Q.    Okay.  And it appears that -- well, looking at

25   Exhibit 2, Ms. Snider started giving you documentation to

Kelly Rogers
January 6, 2017

64

1   look at beginning on December 21st, right?

2        A.    In that time frame.

3        Q.    Okay.

4        A.    Middle of December.

5        Q.    Do you recall Ms. Snider forwarding you a large

6   number of e-mails, one after another, on that Sunday

7   morning?

8        A.    I don't think it was that Sunday morning, but

9   she did forward me several e-mails that had a bunch of

10  attachments.

11       Q.    Okay.  All right.  So -- all right.  So

12  Exhibit No. 2, for example,

13       A.    Uh-huh.

14       Q.    You received, obviously, Exhibit No. 2 to

15  review in preparation for putting together the discipline

16  summary, right?

17       A.    Yes.

18       Q.    And that was the purpose for why Ms. Snider

19  sent you Exhibit 2.  It's so you would have this

20  information to put together that document that's

21  Exhibit 3; correct?

22       A.    Yes.

23       Q.    And then there were other documents that

24  Ms. Snider forwarded to you, right?

25       A.    Yes.

Kelly Rogers
January 6, 2017

65

```
 1      Q.    All right.  Not just Exhibit 2?

 2      A.    No.

 3      Q.    All right.  So take me through your process as

 4  far as getting -- to put together Exhibit 3.

 5      A.    So I printed out the e-mails, stapled, stapled

 6  them so that they would be together, looked at the

 7  e-mails that were -- had a lot of duplicates, because you

 8  know how an e-mail chain -- sometimes I get an e-mail

 9  that was forwarded kind of like halfway through the

10  e-mail chain and then I get the e-mail that was -- or at

11  the end of the chain.

12            So I would kind of dispose of the one

13  that -- the copy that had the middle and just find the

14  ones that had the full.  Then I organized in time

15  continuum, like, had different piles for -- it was just

16  2011, this is 2012, et cetera.  Then I went through and

17  read all the e-mails very, you know, specifically, and

18  highlighted what I thought was the most important.  Then

19  I looked at the template and started filling out some of

20  the basic information that I am able to get from Shell

21  people.  You know, such as the GPA comments, IPS, et

22  cetera.

23            Then I worked on the time line of events,

24  going off of -- as I said, I had piles based on what time

25  it was, and tried to summarize and attach the e-mails
```

Kelly Rogers
January 6, 2017

66

```
 1    that I thought were most important.
 2                 Then I did the employee discipline history
 3    section of putting the examples, some of the examples
 4    that I felt were of her getting feedback and being
 5    coached.
 6                 And then when I had done all of that, I
 7    completed the recommendation and potential risks and
 8    e-mailed it to Alyssa.
 9         Q.    Where are your notes?
10         A.    There were no notes.
11         Q.    You printed off the e-mail, right?
12         A.    Uh-huh.
13         Q.    Yes?
14         A.    Yes.
15         Q.    You didn't take any notes on the e-mail?
16         A.    No.
17         Q.    All you did was highlight it?
18         A.    Yes.
19         Q.    Okay.  Where are those documents?
20         A.    I shredded them.
21         Q.    You shredded them?
22         A.    Because I had the e-mails in e-mail format, and
23    I didn't think it good for confidentiality reasons to
24    have, you know, these e-mails just anywhere, so I
25    disposed of them.
```

Kelly Rogers
January 6, 2017

67

1      Q.     Well, there is more than one alternative than

2   just shredding it.  You could put it in a file, a

3   confidential file, right?

4      A.     That's true.

5      Q.     Okay.  I mean, the discipline summary contains

6   confidential information, right?

7      A.     Yes.  But I felt that we had ways to better,

8   you know, keep that confidential, rather than -- hard

9   copies, I feel, are more apt to float around, more or

10  less.  And since I hadn't added anything new to the

11  documents, I already had the same exact documents, I

12  didn't think it important to keep an additional copy that

13  I felt was less secure.

14     Q.     Okay.  When you are working with management

15  when they come to Human Resources for guidance with

16  respect to an employee, whether it's developing a PIP or

17  figuring out some alternative for handling the employee,

18  are there times that you ever get the sense that the

19  manager is not treating the employee appropriately?

20     A.     Yes.

21     Q.     What do you do in that regard when that

22  happens?

23     A.     I would say the most common thing that I see or

24  what I would immediately commonly advise is that the

25  manager have more conversations with the employee about

Kelly Rogers
January 6, 2017

68

 1    the concerns that they are seeing.

 2        Q.    Well, and I can appreciate that, but what if

 3    you have a manager coming to you and you, from an HR

 4    perspective, think that the employee is being treated

 5    inappropriately, unlawfully, being discriminated against

 6    or retaliated against in some way, how do you handle that

 7    situation?

 8        A.    If I were to believe that there was something,

 9    you know, unlawful going on, then I would start an

10    investigation.

11        Q.    Has that ever happened?  Have you ever had that

12    occasion where a manager has come to you and you think,

13    "Oh, something is not right here, I think that the

14    employee is being treated unlawfully," and you have

15    initiated an investigation?  Do you recall that

16    circumstance actually happening before?

17        A.    I don't recall having a manager coming to me to

18    discuss under-performance that I felt they were treating

19    the employee unlawfully.  Typically, I feel like --

20    typically, when I think that an employee isn't being

21    treated appropriately, it's just that the manager isn't

22    communicating clearly enough with them.

23        Q.    Okay.  You, personally, in your job at Shell,

24    you have investigated allegations of discrimination

25    and/or retaliation, right?

Kelly Rogers
January 6, 2017

69

1     A.    Yes.

2     Q.    That's one of the things that you do, yes?

3     A.    Yes.

4     Q.    Have you ever found that retaliation was taking

5  place, that you can recall?

6     A.    I'm trying to think through the cases.

7     Q.    Sure.

8     A.    I have not -- I have had cases of

9  discrimination, of, you know, alleged discrimination

10  before, but not many that I personally have investigated.

11     Q.    Have you ever found discrimination actually

12  occurred?

13     A.    I don't believe so.

14     Q.    What about retaliation?  Have you ever found

15  that retaliation was occurring or had occurred?

16     A.    I don't believe so.

17     Q.    If you would find that discrimination and/or

18  retaliation was occurring or had occurred, what steps

19  would you take?

20     A.    Obviously, that depends on the specifics of the

21  situation.

22     Q.    Sure.

23     A.    But the individual who was, you know,

24  discriminating or retaliating against -- or retaliating,

25  we would need to address that through the formal

Kelly Rogers
January 6, 2017

1    discipline process.

2        Q.    How would you do that?  What steps would you,

3    what steps would you take?

4        A.    I, personally, would speak with my manager to

5    determine, based on their -- they are, obviously, more

6    experienced than me, what's appropriate.  We also would

7    likely engage legal, if we, if we thought -- if we were

8    concerned about potential risks.  Those would be my two

9    first thoughts.

10       Q.    Okay.  So you would elevate it --

11       A.    Yes.

12       Q.    -- to get somebody else's input, and then it

13   would go from there, depending on what the input was?

14       A.    Yes.

15       Q.    Okay.

16               MR. AHMAD:  Can we take just a

17   couple-of-minute break?

18               THE WITNESS:  Sure.

19               (Brief recess from 11:42 a.m. to

20   11:55 a.m.)

21               (Exhibit No. 4 marked for identification.)

22       Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, are you

23   ready to proceed with your deposition?

24       A.    Yes.

25       Q.    Okay.  You've been handed Exhibit 4 to your

Kelly Rogers
January 6, 2017

71

1    deposition.  Do you recognize that document?

2        A.    Yes.

3        Q.    All right.  And what is Exhibit 4.

4        A.    It is an e-mail from Kerri Frannea with a

5    number of attachments to me and Alyssa that have to do

6    with the Cornelia Noel case.

7        Q.    Okay.  And when you say "the Cornelia Noel

8    case," as of December 9th, 2014, when the e-mail was

9    sent, what did you consider the, quote, unquote,

10   Cornelia Noel case to be?

11       A.    I considered it to be my assignment to

12   summarize documents.

13       Q.    Okay.  So you already had the assignment as of

14   December 9th, 2014?

15       A.    I believe so.

16       Q.    And do you recall reviewing these attachments?

17       A.    I reviewed them as part of compiling the

18   document, but I do not believe I reviewed them until the

19   last week of December.

20       Q.    Okay.  There is one attachment that's

21   forwarded.  The subject is, "I can finally smile again

22   with a song in my heart," do you see that?

23       A.    Yes.

24       Q.    Do you recall what that was all about?

25       A.    I recall that it was a long e-mail that

Kelly Rogers
January 6, 2017

1    Ms. Noel wrote.  I don't remember what was in it or who

2    it was to.

3        Q.    Exhibit 3 is the discipline summary, is that

4    right?

5        A.    Yes.

6        Q.    Okay.

7              (Exhibit No. 5 marked for identification.)

8        Q.    (BY MR. AHMAD)  That is Exhibit 5 to your

9    deposition.  Do you recognize that document?

10       A.    Yes.

11       Q.    Okay.  And this is an e-mail in March of 2015,

12   right?

13       A.    Yes.

14       Q.    And the subject is "CN Case."  I assume that

15   stands for "Cornelia Noel case"?

16       A.    Yes.

17       Q.    All right.  In March of 2015, what did you

18   understand the Cornelia Noel case to be?

19       A.    I knew that Alyssa was investigating concerns

20   brought by Cornelia Noel.

21       Q.    Okay.

22       A.    And obviously I completed the discipline

23   summary, so I had a general awareness of what some of

24   those concerns were.

25       Q.    Okay.

Kelly Rogers
January 6, 2017

73

1        A.     At least in the past.

2        Q.     Okay.  The discipline summary that's Exhibit 3,

3    there are a couple of references in the document,

4    references to Ms. Noel's concerns, right?

5        A.     Yes.

6        Q.     We talked about those earlier?

7        A.     Yes.

8        Q.     The vast majority of what's in Exhibit 3 is not

9    Ms. Noel's concerns that she raised, right?

10       A.     Correct.  I would characterize it as a summary

11   of the e-mail documentation.

12       Q.     Well, it's a summary of the --

13       A.     And some of the e-mails concerned concerns that

14   Ms. Noel had raised.

15       Q.     Right.

16       A.     That's correct.

17       Q.     Yes.  There are a couple of references to those

18   concerns, but the vast majority is what I guess you and

19   Ms. Snider considered to be disciplinary action taken

20   against Ms. Noel, is that fair?  And that's why it's

21   called a discipline summary, you were summarizing the

22   discipline that Ms. Noel had received?

23       A.     I wouldn't call it discipline.

24       Q.     What would you call it?

25       A.     I would call it the coaching and feedback that

Kelly Rogers
January 6, 2017

74

```
 1   she had been given.  The reason why it says "discipline
 2   summary" is that's what the template said.  And in that
 3   case there was more formal discipline, so, perhaps, it
 4   was more appropriate in that case than in this one, but I
 5   did not change the name.
 6        Q.   It's fair to say, isn't it, that the reason
 7   Ms. Snider wanted you to put together the discipline
 8   summary document, why she used that template, is because
 9   Ms. Snider was trying to determine if termination of
10   Ms. Noel was warranted at that time?
11              MS. MOXLEY:  Objection, no showing of
12   personal knowledge.
13        A.   No.  I would say that the reason why Alyssa
14   provided me this particular template is because it was a
15   case in which there was also a large amount of documents
16   that needed to be organized in a time line.
17        Q.   (BY MR. AHMAD)  I understand that.  But setting
18   aside the actual template --
19        A.   Uh-huh.
20        Q.   -- the reason Ms. Snider gave you that
21   assignment is Ms. Snider wanted to look to see if
22   termination of Ms. Noel was warranted at that time,
23   right?
24              MS. MOXLEY:  Objection, no showing of
25   personal knowledge.
```

Kelly Rogers
January 6, 2017

75

```
 1      A.    I can't say for sure.  My -- based on my
 2   conversation with Alyssa when she assigned me this
 3   assignment, my understanding was it really was just to
 4   summarize all these documents and to have someone read
 5   them all, because there was a lot of them.  It took me
 6   three days.
 7      Q.    (BY MR. AHMAD)  Well, sure.  No, I understand
 8   that, but, I mean, you don't just go around summarizing
 9   e-mails, summarizing documents for no reason, for no
10   purpose.  There was a purpose behind it that Ms. Snider
11   had, right?
12                MS. MOXLEY:  Objection, no showing of
13   personal knowledge.
14      Q.    (BY MR. AHMAD)  Do you think that Ms. Snider
15   might have done this with absolutely no purpose behind it
16   in her mind at all?
17      A.    No.
18      Q.    Okay.
19      A.    I believe that the purpose was so that we could
20   have all of these resources summarized in an -- easy to
21   get the key points.
22      Q.    Okay.  But summarized for what purpose?
23                MS. MOXLEY:  Objection, no showing of
24   personal knowledge.
25      Q.    (BY MR. AHMAD)  If you know.
```

Kelly Rogers
January 6, 2017

76

1       A.    Obviously, I can't say for certain.

2       Q.    Okay.  Because Ms. Snider didn't tell you a

3   specific purpose?

4       A.    She told me that the purpose was to summarize

5   all of these documents because she doesn't have time to

6   do it herself.

7       Q.    Well, that's the task.

8       A.    Yes.

9       Q.    Summarizing is the task.  The purpose for the

10  task is something that --

11      A.    She told me that it was an ongoing employee

12  relations issue.

13      Q.    Okay.  Got you.  Exhibit 5, Ms. Snider refers

14  to the time line for Cornelia?

15      A.    Yes.

16      Q.    Okay.  Is that the discipline summary that

17  you're referring to?

18      A.    Yes, that's generally what we refer to it as.

19      Q.    Okay.  And you never updated the discipline

20  summary or the time line after receiving Exhibit 5,

21  right?

22      A.    I believe I did; however, it's quite possible

23  that I never updated the "as of December 31st."

24      Q.    Okay.

25      A.    And that would be an oversight.

Kelly Rogers
January 6, 2017

```
 1      Q.    Well, do you specifically recall one way or the
 2   other?
 3      A.    I feel confident that if Alyssa asked me to do
 4   it, I did it; but I don't remember sitting at my computer
 5   doing it, per se.
 6      Q.    Okay.  So you think you did, but you don't have
 7   a specific recollection of doing it?
 8      A.    Correct.
 9      Q.    In the discipline summary, on the left-hand
10   side, it's set up on the left-hand side, there is a date,
11   and I guess that's why you called it a time line, right?
12   It's in chronological order once you get into the actual
13   meat of the document?
14      A.    Yes.
15      Q.    All right.  And in the middle is a description?
16      A.    The middle is a summary of the e-mails and the
17   relevant e-mails or documents are in the right column.
18      Q.    Okay.  And then what does that mean?  What's in
19   the right column?  Are those attachments to this?
20      A.    Yes.
21      Q.    Okay.
22      A.    Or links.
23      Q.    Links?
24      A.    So you could click on it and it would pop up.
25      Q.    So how did you go about doing this?  You just,
```

Kelly Rogers
January 6, 2017

1   like, had the document and then you were basically typing

2   up a summary or --

3       A.   Yes.

4       Q.   As you're going through each document?

5       A.   Yes.  I believe first I went through the

6   documents and determined the ones that I thought were

7   significant enough to put in the time line and then I

8   summarized those in chronological order.

9       Q.   How did you determine which portions from a

10  document to include in your summary?

11      A.   A lot of that was just a judgment call, but I

12  specifically was looking for, you know, feedback and

13  coaching that Cornelia had been given.  You know, when

14  she raised concerns, that was significant.  And just

15  information that I thought was key to kind of understand

16  the time line of events.

17      Q.   And you -- I think we talked earlier.  You

18  don't know -- or maybe you do.  On the front page of

19  Exhibit 3, there is an equated date.

20      A.   Yes.

21      Q.   What does that mean?

22      A.   That would be the date that she, Cornelia,

23  joined Shell.  Equated service date.

24      Q.   Okay.  And so she joined in January of 2008?

25      A.   Yes.

Kelly Rogers
January 6, 2017

1    Q.    And so I take it that you went back to

2  January of 2008 for the relevant documentation?

3    A.    No.  I only utilized the documents that I had

4  been provided.

5    Q.    Okay.  So whoever provided you the documents

6  went back as far as she started, as far as you can tell?

7    A.    I don't believe there were any documents that

8  went back that far, because my understanding is that the

9  real concerns didn't come to light until the 2011 time

10 frame.  Or, well, here's one in 2009, late 2009.

11   Q.    Okay.

12   A.    So that's the earliest that I received.

13   Q.    All right.  And so, as far as you know, the

14 documents that they reviewed to give to you to summarize,

15 they went back, as far back as she started with Shell, is

16 that fair?

17   A.    I can't say for certain.  My, my take would be

18 that they sent what they thought were relevant, so when,

19 you know, concerns were raised and when there were issues

20 brought to light, HR typically doesn't hear a peep until

21 something is going bad.

22   Q.    What is an IPF?

23   A.    An individual performance factor.

24   Q.    Okay.  And that goes year to year -- well, each

25 year an employee is given an IPF?

Kelly Rogers
January 6, 2017

80

```
 1      A.    Yes.

 2      Q.    And it's a number?

 3      A.    Yes.

 4      Q.    Okay.  And it might stay the same or it might

 5   go up, it might go down?

 6      A.    Yes.

 7      Q.    Okay.  And when it goes down over a period of

 8   time, in your view, that shows a decline in performance,

 9   right?

10      A.    A decline in relative performance against their

11   peers.

12      Q.    Well, it shows a decline in performance, right?

13      A.    Not necessarily.  An IPF is a measure of

14   relative performance against your peers.

15      Q.    What's the difference?

16      A.    It's not an absolute number.  So I can't say,

17   "Oh, a 1.0 means you're meeting expectations and a .7

18   means that you're under-performing, because it's relative

19   against your peers in that year, and that peer group

20   changes every year.

21      Q.    Okay.  So just because somebody's IPF may go

22   down over a period of time does not mean, necessarily,

23   that their performance has declined?

24      A.    I would say generally it's a signal that that

25   is likely, but it does not absolutely say that because
```

Kelly Rogers
January 6, 2017

81

```
1   maybe that particular year all of the peers in their job

2   grade were just doing phenomenal work, and while they

3   still -- you're meeting expectations and performing at

4   the same absolute levels they had the year past, compared

5   to their peers they didn't deliver as much.

6       Q.   So how do you know which is the case?  How do

7   you know whether it's a decline in performance or whether

8   the peers around the employee just got better?

9       A.   It's difficult to tell.

10      Q.   But how do you tell?  I understand it may be

11  difficult, but how do you go about determining that?

12      A.   You can never know for certain, but by talking

13  to managers, especially if a manager had seen -- had been

14  involved in, you know, both IPF sessions, they should be

15  able to add context.

16      Q.   Who was Ms. Noel's manager at the time?

17      A.   Gouri.

18      Q.   At the time you put together the summary?

19      A.   Yes.

20      Q.   Okay.  And you did not speak to Gouri about

21  Ms. Noel's 2014 IPF?

22      A.   No.

23      Q.   Okay.

24      A.   I pulled it from Shell people.

25      Q.   What does that mean?
```

Kelly Rogers
January 6, 2017

82

1      A.     That's our HR online system.

2      Q.     Okay.  It's a system?

3      A.     Yes.

4      Q.     You didn't talk to anybody about Ms. Noel's

5  IPF?

6      A.     No.

7      Q.     Okay.  You just got that number from the

8  system?

9      A.     Yes.

10     Q.     And put it down in the discipline summary?

11     A.     Yes.

12     Q.     Why?

13     A.     Because it's part of the relevant background

14  information that you would include on a document like

15  this.

16     Q.     Why?

17     A.     It provides additional context.

18     Q.     How so?

19     A.     Because it can, it can -- it's the only measure

20  that we have to discuss performance in -- very simply,

21  just, you know, you see -- there is -- obviously, you

22  react differently to seeing, you know, a .2 and a 1.5.

23     Q.     Right.  But I thought you told me that you

24  couldn't really tell much from it until you talked to the

25  manager or you talked to the people.

Kelly Rogers
January 6, 2017

83

1     A.    You asked me before if, if a lower IPF year to

2   year would automatically indicate a lower level of

3   performance, and I said that you can't tell unless you

4   talk to a manager if they have that knowledge.

5     Q.    Okay.  But you never got that knowledge?

6     A.    No.

7     Q.    And, yet, you put in the discipline summary

8   that Ms. Noel's IPF history portrays an individual with a

9   sharp decline in performance.

10    A.    I did.

11    Q.    Okay.  Nothing about relative to her peers, is

12  it?

13    A.    In the last sentence, it says, "Recent IPFs are

14  more reflective of Cornelia's comparative performance

15  with her peers."

16    Q.    But how do you know that?

17    A.    It was my understanding based on reading the

18  e-mails.

19    Q.    Okay.  But you didn't talk to anybody?

20    A.    Specifically, Gouri's e-mail in Exhibit 2 led

21  me to believe that to be the case, but I did not speak

22  directly with Gouri about that.

23    Q.    What would you have had to have done to speak

24  with Gouri?  How difficult of a task would that be?

25    A.    Not difficult.

Kelly Rogers
January 6, 2017

84

1              (Exhibit No. 6 marked for identification.)

2      Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, that is

3  Exhibit 6 to your deposition.  Do you recognize that

4  document?

5      A.    Yes.

6      Q.    All right.  And go ahead and take a minute to

7  review it.  Is this one of the documents that you

8  reviewed in preparation for putting together your

9  discipline summary?

10      A.    I can't say for certain, but I don't see why it

11  wouldn't be.

12      Q.    Okay.  And that's one that Ms. Snider forwarded

13  to you at 6:00 in the morning on Sunday, December 21st,

14  right?

15      A.    Yes.

16      Q.    How do you know if this document went into

17  your discipline summary at all?  Do you have a way of

18  telling?

19      A.    I would have to look at the summary and see if

20  it was one of the e-mails I summarized and attached.

21      Q.    Okay.  Can you do that?

22      A.    Yes, I did.

23      Q.    Okay.  So at some point while you were putting

24  together the discipline summary for Ms. Noel you reviewed

25  Exhibit 6?

Kelly Rogers
January 6, 2017

85

1      A.    Yes.

2      Q.    Okay.  Who is Jamie Allen?

3      A.    Jamie Allen was the HR and the business person

4    for PTPD, our deepwater projects at this time.

5      Q.    All right.  And did you know Ms. Allen?

6      A.    Yes.

7      Q.    Does she still work here?

8      A.    At Shell, yes.

9      Q.    Okay.  In Houston?

10     A.    No.

11     Q.    Where does she work?

12     A.    Convent, Louisiana.

13     Q.    Did she ever work in Houston?

14     A.    Yes.  At this time, she worked in Houston.

15     Q.    All right.  Did you ever speak to her about

16   Ms. Noel?

17     A.    Yes.

18     Q.    And what did y'all talk about?

19     A.    I spoke with her at the meeting that I

20   mentioned before with Jerry Jackson and, I think, Debo,

21   but -- yeah, Debo.

22     Q.    Which would have been when?

23     A.    Q1 2015.

24     Q.    What was the purpose of that meeting?

25     A.    That was when Alyssa was investigating

Kelly Rogers
January 6, 2017

86

1    Ms. Noel's concerns and I was the scribe.

2         Q.    Okay.

3         A.    And Jamie assisted Alyssa in asking questions.

4         Q.    Asking questions about what?

5         A.    I mentioned before the things that I remember

6    specifically that Alyssa and Jamie asked questions about

7    were, you know, Nigeria car policy and Nigeria cell phone

8    policy and things along those lines.

9         Q.    Do you recall discussing why Ms. Noel was

10   repatriated?

11        A.    I don't recall, specifically, but I would

12   assume that was a topic of conversation.

13        Q.    And do you recall what was discussed in that

14   regard?

15        A.    No.

16        Q.    All right.  You talked about a meeting that was

17   held in late 2014.

18        A.    Yes.

19        Q.    And who all was present for that meeting?

20             MS. MOXLEY:  Objection, asked and

21   answered.

22        Q.    (BY MR. AHMAD)  You can answer.

23        A.    Me, Alyssa, Doug Peart and Gouri.

24        Q.    Okay.  And how long was that meeting?

25        A.    30 minutes.

Kelly Rogers
January 6, 2017

87

1      Q.     How do you remember that?

2      A.     How do I remember that it was 30 minutes?

3      Q.     Yeah.

4      A.     It wasn't a long, drawn-out conversation.  I

5   specifically remember the kind of interview with the

6   Nigeria folks as being a long time and a lot of typing.

7      Q.     What do you mean "the interview with the

8   Nigeria folks"?

9      A.     That's the meeting that I just discussed, I

10  just mentioned, where we --

11     Q.     Oh, I see.

12     A.     Yeah.

13     Q.     So it was much longer than 30 minutes?

14     A.     That one I remember as much longer.

15     Q.     Okay.

16     A.     So I'm assuming that this meeting in 2014 was

17  more along the line of 30 minutes.

18     Q.     Got you.  And what was discussed during that

19  meeting?

20            MS. MOXLEY:  Objection, asked and

21  answered.

22     A.     From what I remember, Doug and Gouri, you know,

23  discussed some of the things that had occurred since

24  Ms. Noel had been repatriated to Houston and were asking

25  Alyssa for advice on how to handle the situation.

Kelly Rogers
January 6, 2017

88

1      Q.    And what was the situation?

2      A.    I believe it was along the lines of what is

3  listed in Exhibit 2.

4      Q.    Okay.

5      A.    Behavioral issues.

6      Q.    Do you recall any discussion of terminating

7  Ms. Noel's employment during that meeting?

8      A.    Yes, I believe it came up as one of the

9  potential outcomes.

10     Q.    What was discussed about that?

11     A.    Just I remember Alyssa saying things like, "We

12 may" -- as far as next steps, "We may need to" -- you

13 know, "There are a variety of ways we can try to address

14 this situation."

15     Q.    And what were those ways, did she say?

16     A.    One was termination, another would have been, I

17 believe, maybe written warning and performance

18 improvement plan.  Things along those lines.

19     Q.    Anything else you recall from the meeting?

20     A.    No.

21     Q.    So taking a look at -- all right.  So where on

22 the discipline summary did you see the reference to

23 Exhibit 6?  How do we know that it's included in there

24 and that you read it?

25     A.    It is Page 11, the row that says "March 4,

Kelly Rogers
January 6, 2017

89

1    2014," and on the column with the attachment, it appears

2    to be the same -- the e-mail appears to have the same

3    title.

4         Q.    Okay.  All right.  And in that you state,

5    "Jamie Allen helps steer Cornelia's Nigeria supervisors

6    on what coaching to provide her on her repatriation,"

7    right?

8         A.    Yes.

9         Q.    Okay.  "The working relationships between you

10   and various others" -- so you actually quote from the

11   e-mail?

12        A.    Yes.

13        Q.    Okay.  All right.  So looking at Exhibit 6, the

14   quote -- in that language, Ms. Allen actually states why

15   Ms. Noel was chosen for repatriation, right?

16             MS. MOXLEY:  Objection, mischaracterizes

17   the document.

18        A.    My take on this e-mail is that it is Jamie

19   summarizing to management, you know, next steps, as well

20   as coaching Jerry on what -- how to approach his

21   conversation with Cornelia.

22        Q.    (BY MR. AHMAD)  Right.  And in doing that,

23   Ms. Allen would have obviously been briefed on the

24   situation, right?

25        A.    Yes.

Kelly Rogers
January 6, 2017

90

```
 1      Q.    Okay.  And in her e-mail she actually sets
 2   forth the specific reason for why Ms. Noel was chosen for
 3   repatriation; correct?
 4              MS. MOXLEY:  Objection, mischaracterizes
 5   the document.
 6      Q.   (BY MR. AHMAD)  Doesn't she state that directly
 7   in the e-mail?
 8              MS. MOXLEY:  Objection, mischaracterizes
 9   the document.
10      A.    I don't think I personally would go so far as
11   to say that.  I really think it's Jamie coaching Jerry on
12   how to approach his conversation with Cornelia.
13      Q.   (BY MR. AHMAD)  Sure.  Well, let's, let's take
14   a look at that.  The last part of the italicized portion,
15   she states, "Therefore, we will be repatriating you to,"
16   and then it's "XYZ" job because they didn't know what job
17   she was going to have, right?
18      A.    Yes.
19              MS. MOXLEY:  Objection, no showing of
20   personal knowledge.
21      Q.   (BY MR. AHMAD)  -- "reporting to name," because
22   they didn't know who she was going to report to, right?
23              MS. MOXLEY:  Objection, no showing of
24   personal knowledge.
25      Q.   (BY MR. AHMAD)  Right?  That's why she didn't
```

Kelly Rogers
January 6, 2017

91

```
 1    put the specific job in the specific report?

 2                MS. MOXLEY:  Objection, no showing of

 3    personal knowledge.

 4        A.    Obviously, I can't say for certain, but I would

 5    assume, based on --

 6        Q.    (BY MR. AHMAD)  Sure.  "So, therefore, we will

 7    be repatriating you."  So what's the reason listed by

 8    Jamie before the "therefore"?

 9                MS. MOXLEY:  Objection, mischaracterizes

10    the document.

11        A.    I think that you also need to take in

12    consideration the sentence before.

13        Q.    Okay.

14                MR. AHMAD:  Well, I'm just going to object

15    as nonresponsive.

16        Q.    (BY MR. AHMAD)  I asked you a very specific

17    question.  So when she states "Therefore, we will be

18    repatriating you," what's the language before the

19    "therefore," the basis for the repatriation, according to

20    Ms. Allen?

21                MS. MOXLEY:  Objection, mischaracterizes

22    the document.

23        Q.    (BY MR. AHMAD)  Could you read that for me,

24    please?

25        A.    "You have raised your own concerns about the
```

Kelly Rogers
January 6, 2017

92

1    work environment."

2         Q.    So that's what Ms. Allen states, right?

3         A.    Yes.

4         Q.    "You have raised your own concerns about the

5    work environment, therefore, we will be repatriating

6    you," right?

7         A.    That is what the e-mail says.

8         Q.    Okay.

9         A.    However, I think that the greater context gives

10   more background -- the previous statements give more

11   background and context to why she stated that in that

12   way.

13        Q.    Well, no context is needed, is there?

14               MS. MOXLEY:  Objection, argumentative.

15        A.    I think there is.

16        Q.    (BY MR. AHMAD)  Why is that?  Why do you think

17   that?

18        A.    Because I think that the greater context -- it

19   better shows the intent that I see from this statement,

20   which, as I said before, was to coach Jerry on how to

21   have his conversation with Cornelia.

22        Q.    And she coaches Jerry.  And that's

23   Jerry Jackson, right?

24        A.    Yes.

25        Q.    Okay.  She is coaching Jerry to tell Ms. Noel

Kelly Rogers
January 6, 2017

1   the reason for the repatriation, right?

2              MS. MOXLEY:   Objection, mischaracterizes

3   the document.

4       A.    No.

5       Q.    (BY MR. AHMAD)  No, you don't believe so.  Why

6   is that language in there?

7              MS. MOXLEY:   Objection, no showing of

8   personal knowledge.

9       A.    I didn't write it, so I don't know.

10      Q.    (BY MR. AHMAD)  Did you ask Ms. Allen why she

11  put that in there?

12      A.    No.

13      Q.    That statement, that, "You have raised your own

14  concerns about the work environment, therefore we will be

15  repatriating you," from an HR perspective, that's

16  concerning to see, is that fair?

17             MS. MOXLEY:   Objection, argumentative.

18      A.    I think that the greater -- in the greater

19  context it concerns me less than if I were to see only

20  that sentence.

21      Q.    (BY MR. AHMAD)  Okay.  Well, it might concern

22  you less, but it still concerns you, right?

23      A.    I can't say exactly what was meant because I

24  did not write this.

25      Q.    But you're in Human Resources?

Kelly Rogers
January 6, 2017

94

1      A.     That's correct.

2      Q.     Okay.  And that's why I'm asking you.  From

3   your perspective in Human Resources.  Okay?

4      A.     Due to the greater context of the italicized

5   statement, I was not very concerned when I read this,

6   because, as I said before, I truly believed that Jamie

7   was coaching Jerry on how to approach his conversation

8   with Cornelia.

9      Q.     Let me ask you this, and then I'll get back to

10  my question.

11            MR. AHMAD:  I'm going to object as

12  nonresponsive.

13     Q.     (BY MR. AHMAD)  So let me ask you this:  When

14  somebody complains that they are being treated illegally

15  in the workplace --

16     A.     Yes.

17     Q.     -- can that complaint -- can that damage the

18  relationship between the employee and the manager who is

19  being complained about?

20     A.     Yes.

21     Q.     All right.  So that's one of the ways that you

22  can damage relationships, is by complaining of illegal

23  conduct, fair?

24     A.      I would say you can damage a relationship with

25  a specific -- not necessarily by complaining about the

Kelly Rogers
January 6, 2017

95

1    conduct, just the fact that it happens at all can damage

2    the relationship.

3        Q.    The complaint?

4        A.    The discrimination or retaliation --

5        Q.    Well, sure.

6        A.    -- and everything.

7        Q.    Okay.  Well, that's a good point, too.  A

8    relationship can be damaged because an employee is being

9    discriminated against or retaliated against, right?

10       A.    Yes.

11       Q.    A relationship can be damaged because the

12   employee complains about that, right?

13       A.    Yes.

14       Q.    Okay.  So there are multiple ways for a

15   relationship that an employee has with other folks,

16   whether it be co-workers or managers, there are multiple

17   ways that those relationships can be damaged, fair?

18       A.    Yes.

19       Q.    Okay.  All right.  So going back to my

20   question:  From a Human Resources perspective -- by the

21   way, how long have you worked in Human Resources?

22       A.    Two and a half years.

23       Q.    All right.  And you started when?

24       A.    July 2014.

25       Q.    Okay.  So right around the time that Ms. Noel

Kelly Rogers
January 6, 2017

96

```
 1   was being repatriated?
 2       A.    Yes.
 3       Q.    All right.  What did you do before going to
 4   work for Shell in 2014?
 5       A.    I was a student.
 6       Q.    Okay.  Where?
 7       A.    Cornell.
 8       Q.    All right.  And where did you go to high
 9   school?
10       A.    New Jersey.
11       Q.    What part?
12       A.    Parsippany.
13       Q.    Okay.  And when did you graduate from Cornell?
14       A.    May 2014.
15       Q.    And what kind of degree?
16       A.    I have a Bachelor's in industrial and labor
17   relations.
18       Q.    Okay.  All right.  So from a Human Resources
19   perspective, hearing that somebody is being repatriated
20   because they raised concerns about their work
21   environment, that statement, in and of itself, concerns
22   you from an HR perspective?
23             MS. MOXLEY:  Objection, argumentative.
24   Objection, mischaracterizes the document.
25       Q.    (BY MR. AHMAD)  True or false?
```

Kelly Rogers
January 6, 2017

97

```
1              MS. MOXLEY:  Same objection.

2              MR. AHMAD:  I'm not referring to any

3    particular document, so I don't know why you said that.

4        A.    Generically --

5        Q.    (BY MR. AHMAD)  Yes.

6        A.    -- that would concern me.

7        Q.    Okay.  Did you do anything to investigate the

8    statement on Exhibit 6?

9        A.    I do not believe that this document falls into

10   your previous question, because, as I said before, the

11   full context, I do not believe that the reason why

12   Ms. Cornelia was repatriated was solely because she

13   raised concerns about her work environment.  The reason

14   why is because of all the e-mails that I've read.  That's

15   why I don't believe that.  And also because of the

16   previous statements here.

17       Q.    Well, yeah.  Ms. Allen -- well, hold on.

18             MR. AHMAD:  Let me object as

19   nonresponsive.

20       Q.    (BY MR. AHMAD)  And let me get back to my

21   question and then we'll talk about that.  Okay?

22             So you did nothing to investigate

23   Ms. Allen's statement that appears on Exhibit 6; correct?

24       A.    No.

25       Q.    That's not correct?
```

Kelly Rogers
January 6, 2017

98

1      A.    No, I did nothing to investigate.

2      Q.    Okay.  So that is correct?  You did nothing to

3 investigate?

4      A.    Yes.

5      Q.    Okay.  All right.  And what is it about the

6 context, what is it about the other things -- you

7 mentioned language before that statement.  Point the

8 language to me that tells you, from an HR perspective,

9 that you should not be concerned that she is being

10 repatriated due to concerns that she raised about her

11 work environment.

12     A.    Things like, "An expatriate assignment is not

13 just about your technical ability.  It is also about

14 engaging with a team in a local environment and you have

15 not demonstrated you can do this successfully.  You have

16 also raised your own concerns about the work

17 environment."

18     Q.    Okay.

19     A.    So I think what she is trying to portray here

20 is that it's not just about the technical ability.  You

21 also, in order to be successful in an expatriate

22 assignment, or, frankly, any assignment, need to be

23 engaged with the team, and that has been proven over the

24 course of time to not -- Cornelia has not been able to do

25 that successfully with this particular team.

Kelly Rogers
January 6, 2017

99

1      Q.     Do you think it's because she was being
2   discriminated against?
3      A.     I personally do not believe that there is
4   evidence to say that she was discriminated against.
5      Q.     Well, you didn't investigate it.
6      A.     Because I didn't investigate it, I can't say
7   that for certain.
8      Q.     Right.  Ms. Allen states in the first sentence
9   that, "Working relationships between you and various
10  others have deteriorated to the point it is having a
11  significant effect on the project."  Did I read that
12  correctly?
13     A.     Yes.
14     Q.     Okay.  Sitting here today, you don't know why
15  the relationships deteriorated, right?
16     A.     Not for certain, no.
17     Q.     Okay.  Ms. Noel was saying that they were
18  deteriorated because she was being discriminated against
19  and because she complained of discrimination, right?
20     A.     Yes.
21     Q.     Okay.  I mean, you have no idea whether that,
22  that perception on Ms. Noel's part is true or false,
23  right?
24     A.     Not for certain, but my -- I did not see any
25  evidence that would lead me to believe that there was

Kelly Rogers
January 6, 2017

100

1   basis in the claim.

2       Q.   Well, I know.  We talked about that.

3       A.   Yeah.

4       Q.   But you didn't investigate anybody.  You didn't

5   do any of the steps that you would do if you were

6   actually investigating this from an HR perspective,

7   right?

8       A.   Yes.

9       Q.   Okay.  And so, you know, the fact that you

10  didn't see any evidence of it, that's really not

11  significant here because you didn't investigate it,

12  right?

13              MS. MOXLEY:  Objection, argumentative.

14      Q.   (BY MR. AHMAD)  Right?

15              MS. MOXLEY:  Same objection.  You can

16  answer.

17      A.   If you're asking about -- so as far as my

18  recommendation goes, it was only based on, obviously, the

19  things that I reviewed.

20      Q.   (BY MR. AHMAD)  Sure.  Okay.  Fair enough.

21  Now, we talked a little bit earlier, the statement that,

22  "You have raised your own concerns about the work

23  environment, therefore, we'll be repatriating you," that,

24  on some level, can be concerning from an HR perspective,

25  right?

Kelly Rogers
January 6, 2017

101

 1      A.      That statement in isolation, yes, can be
 2   concerning.
 3      Q.      Okay.  You know, I noticed that on your
 4   discipline summary you quote from a good part of the
 5   section, but you didn't include that quote about the
 6   reason she was being repatriated, did you, in your
 7   discipline summary?
 8              MS. MOXLEY:  Objection, mischaracterizes
 9   the document.
10      Q.   (BY MR. AHMAD)  You left that out.
11              MS. MOXLEY:  Same objection.
12      A.    I do not believe that that is the reason why
13   Ms. Noel was repatriated.
14      Q.   (BY MR. AHMAD)  What is the reason why?
15      A.    I believe that the reason why I included some
16   part -- the earlier part of the statement is because, as
17   I said before, I would say in summarizing this e-mail I
18   think that is Jamie coaching Jerry on how to have this
19   conversation with Cornelia, which is what I say in the
20   document.
21      Q.    Sure.  But that's to -- she is coaching him on
22   how to communicate to Ms. Noel that she's being
23   repatriated, right?
24      A.    Yes.
25      Q.    So one of the things you would put in

Kelly Rogers
January 6, 2017

```
 1   communicating that an employee is being repatriated is to

 2   tell them why they are being repatriated, fair?

 3              MS. MOXLEY:  Objection, argumentative.

 4       A.    Yes.

 5       Q.    (BY MR. AHMAD)  Okay.  And that's why Ms. Allen

 6   included that language in the e-mail, right?

 7              MS. MOXLEY:  Objection, argumentative.

 8   Objection, no showing of personal knowledge.

 9       Q.    (BY MR. AHMAD)  Is that a fair interpretation

10   of the document?

11              MS. MOXLEY:  Objection, argumentative.

12   Objection, no showing of personal knowledge.  Objection,

13   mischaracterizes the document.

14       A.    I didn't write it.  I don't know what was in

15   Jamie's head when she was writing it.  I don't --

16       Q.    Because you didn't ask her?

17       A.    No.

18       Q.    Okay.  But it's a fair interpretation of the

19   document that that's why she included that language in

20   there, is because if you're going to sit down with an

21   employee and tell them that they are being repatriated,

22   one of the things that you want to tell them is why,

23   right?

24              MS. MOXLEY:  Objection, mischaracterizes

25   the document.
```

Kelly Rogers
January 6, 2017

103

1      A.    I think it's difficult to say what is fair and
2   what is not fair a lot of times, and I don't feel that I,
3   in this case, can say what was fair and what was not
4   fair, just because of lack of knowledge.
5      Q.    (BY MR. AHMAD)  Well, let me ask it a different
6   way.  If an employee is going to be told that they are
7   being repatriated from their assignment early, before
8   it's scheduled to end, do you think that the employee's
9   first question is going to be "Why?"
10     A.    Yes.
11     Q.    Okay.  If Human Resources had recommended a
12   personal improvement plan for Ms. Noel, instead of you
13   recommending termination, if she had been recommended --
14   or if you had recommended that she be put on a personal
15   improvement plan, that would have been about a 90-day
16   personal improvement plan, right?
17     A.    A typical personal improvement is 90 days.
18     Q.    And so if she were put on that effective
19   January 1st, that would go through the end of March,
20   right?
21     A.    Yes.
22     Q.    Okay.  What's the harm in doing that?  As of
23   January 1st, 2015, why not put Ms. Noel on a PIP in
24   accordance with the SMART plan?
25              MS. MOXLEY:  Objection, argumentative.

Kelly Rogers
January 6, 2017

104

1  Objection, mischaracterizes the witness' prior testimony.

2      A.    Are you asking me why I recommended termination

3  rather than a performance improvement plan?

4      Q.    (BY MR. AHMAD)   No.

5      A.    Then I don't think I understand your question.

6      Q.    Sure.  Was there any harm in putting Ms. Noel

7  on a personal improvement plan in December of 2014?

8      A.    What do you mean by "harm"?

9      Q.    You don't know what "harm" means?

10          MS. MOXLEY:   I think she's asked you to

11  clarify your question.

12     A.    Yeah.  I think -- can you clarify your

13  question?  I feel like "harm" is very broad and has

14  specific, you know, implications which I don't know if I

15  fully understand.

16     Q.    Okay.  Why not put Ms. Noel on a PIP in

17  December of 2014?

18     A.    I did not recommend placing Ms. Noel on a PIP

19  because I felt that it would, it would not help the

20  situation because of the severity of the behavioral

21  issues that I saw documented in these e-mails.

22     Q.    Well, we talked earlier, in your experience,

23  about 30 percent of the time a PIP can be effective,

24  right?

25     A.    That's correct.

Kelly Rogers
January 6, 2017

```
 1      Q.    Okay.  And the reason a PIP can be effective is
 2   because it is required to follow a specific set of
 3   guidelines, the SMART plan, right?  Is it SMART plan,
 4   SMART goals?
 5      A.    SMART goals, performance improvement plan.
 6      Q.    Yeah.  And you understand, from an HR
 7   perspective, when goals or performance issues are
 8   specific, an employee can respond much better to that
 9   kind of feedback when the performance allegations are
10   specific, right?
11      A.    That's correct.
12      Q.    And that's why they are required to be specific
13   under the SMART plan, right?
14      A.    That's correct.
15      Q.    And measurable, right?
16      A.    Yes.
17      Q.    Okay.
18      A.    I did not recommend it in this circumstance
19   because I believe, personally believe that in order for a
20   performance improvement plan to have any chance of being
21   effective, the first thing is that the employee needs to
22   take personal responsibility for their part in the
23   performance concerns and also want to improve.
24      Q.    So if an employee is being discriminated
25   against, and they are told they are performing poorly
```

Kelly Rogers
January 6, 2017

106

```
 1   because of discrimination, is that employee also supposed
 2   to accept responsibility, even if that is -- even if that
 3   motivation for the performance evaluation is unlawful?
 4   Is an employee really supposed to take responsibility for
 5   that?
 6                MS. MOXLEY:  Objection, argumentative.
 7       A.    Of course, if there is discrimination, that is
 8   the most important part; however, in this particular
 9   case, based on the e-mails that I read, I did not see any
10   clear discrimination, and I also -- the concerns were
11   investigated and they did not find any basis for the
12   concerns.
13       Q.    (BY MR. AHMAD)  How do you know that?  I
14   thought you didn't see the results of the investigation.
15       A.    My confidence is that we would not have -- if
16   there was discrimination, that would have been addressed.
17       Q.    Okay.  So you have confidence in Shell's HR
18   department?
19       A.    Yes.
20       Q.    Okay.  And so you're confident that if Ms. Noel
21   raised allegations, then they would have been
22   investigated and the investigation would have been
23   thorough and the investigation would have reached the
24   right conclusion?
25       A.    Yeah.
```

Kelly Rogers
January 6, 2017

107

 1      Q.    Okay.  Let's assume for a moment that an

 2   employee is being attacked, an employee's performance is

 3   being attacked because there is discrimination going on.

 4   Okay?  You have a supervisor who is discriminating

 5   against an employee and one of the forms of

 6   discrimination can be a bad performance review or an

 7   attack on performance, right?

 8      A.    Yes.

 9      Q.    Okay.  And so if that's the motivation under

10   that scenario, an employee is being, their performance is

11   being attacked based on some impermissible motivation, is

12   it your opinion that the employee is simply supposed to

13   just accept responsibility for whatever those criticisms

14   are?

15      A.    No.

16      Q.    Okay.  You took a number of documents, a

17   mountain of information, and you condensed it into a

18   12-page document, right?

19            MS. MOXLEY:  Objection, mischaracterizes

20   the document.

21      A.    I took a number of e-mails and condensed it to

22   a 12-page document.

23      Q.    (BY MR. AHMAD)  It is 12 pages, right?

24            MS. MOXLEY:  Objection, mischaracterizes

25   the document.

Kelly Rogers
January 6, 2017

108

1        A.     The last number on the last page is 12, so I

2   would assume it's 12.

3        Q.     (BY MR. AHMAD)  Okay.  You could have very

4   easily taken this and converted it into a format that was

5   your PIP format with specific feedback to the employee,

6   right?

7        A.     No.

8        Q.     Okay.  Why not?

9        A.     Because it's important that the PIP be written

10  by the manager who has direct -- has directly witnessed

11  the areas of under-performance.

12       Q.     Why is that?

13       A.     Because I can't provide specific examples of

14  the under-performance and I also can't really come up

15  with specific goals because I don't know what exactly the

16  work that a specific employee should be doing and what's

17  going on in the department and things like that.

18       Q.     Okay.  So are you saying that without talking

19  to some other folks you would have no idea what to put as

20  far as the corrective behavior that Ms. Noel has to

21  engage in?

22       A.     That's correct.

23       Q.     Okay.  And without talking to others, you would

24  have no idea what to put in a PIP as far as the specific

25  performance issues that Ms. Noel had?

Kelly Rogers
January 6, 2017

109

1    A.    I could, I could theorize on what some of those

2  would be based on the e-mails that I read, but we always

3  look for people that have the personal, have seen it and

4  can describe it and provide us a specific example, which

5  would not be me.

6    Q.    Right.  Just theorizing, that doesn't comport

7  with the SMART plan, right?

8    A.    No.  And that's why HR doesn't write it.

9    Q.    Okay.  You believe that during Ms. Noel's

10 employment she received feedback on her performance,

11 right?

12   A.    Yes.

13   Q.    Okay.  And what kind of feedback did Ms. Noel

14 receive?

15   A.    For instance, in the 2014 GPA comments, her

16 manager at the time stated, "Based upon my own

17 interactions with Cornelia, as well as feedback I've

18 received from others who have interacted with her,

19 Cornelia comes across heavy on advocacy and less on

20 inquiry, seeking to understand, and often displays a

21 know-it-all attitude.  This can be offputting to people."

22   Q.    Where are you reading from?

23   A.    Page 1 of Exhibit 3 at the bottom.

24   Q.    Okay.  The middle bullet point?

25   A.    Yes.

Kelly Rogers
January 6, 2017

110

1      Q.    Okay.

2      A.    It says, even above that it says, "Cornelia has

3  been unable to make an impact in the role, i.e., be able

4  to provide tangible results and support to the global

5  SURF projects.  This is due in large measure to her

6  inability to create and sustain collaborative relations

7  with stakeholders.

8      Q.    Okay.  But in both of those points, and I think

9  we talked about this earlier, but these statements, they

10 do not comport with the SMART plan?

11             MS. MOXLEY:  Objection, vague and

12 mischaracterizes the witness' prior testimony.

13     Q.    (BY MR. AHMAD)  Right?

14     A.    These statements are quotes from her 2014 GPA,

15 which is her performance review.

16     Q.    No, I understand that.

17     A.    Which she would have seen.

18     Q.    Right.  No, I understand that.  But these

19 statements, if they are put into a PIP, they would not be

20 sufficient.  You need to be more specific on what the

21 employee is supposed to do, would you agree?

22     A.    These would be useful as examples to describe

23 the under-performance that the manager has seen, but, you

24 are correct, they would not be in the goals section.

25     Q.    Okay.  All right.  Because you state that you

Kelly Rogers
January 6, 2017

111

1    feel, or at least Shell can make the argument that

2    Ms. Noel has received more than enough feedback, right?

3        A.    Yes.

4        Q.    Okay.  And so can you point me to any other

5    feedback that you think Ms. Noel received during her

6    employment?

7        A.    The entire 2013 GPA, the 2012 GPA.

8        Q.    The entire, the entire thing is feedback?

9        A.    This is her performance review, which is, in

10   and of itself, feedback.  And some of it is very clear on

11   some of the collaboration issues, et cetera.

12       Q.    Where?  Give me an example.

13       A.    "In summary, top three areas for

14   improvement" --

15       Q.    Where are you reading from?

16       A.    Page 3.

17       Q.    Uh-huh?

18       A.    At the top box, "Take destructive feedback,

19   seeking to understand, and less of rebuttals."

20       Q.    Whoa, whoa, whoa.  Okay.  "In summary,

21   three" --

22       A.    "Deal with others with respect and avoid

23   display of superiority and know-it-all attitude.  Take

24   opportunity of business activities to collaborate, even

25   when not invited.  Pursue inclusion even when excluded

Kelly Rogers
January 6, 2017

1   through face-to-face engagement with peers and others,

2   less of e-mails, and improved e-mail communication

3   style."

4       Q.   All right.  So let's take these one by one.

5   How did Ms. Noel not fully take on the duties of the head

6   of subsea hardware discipline?

7               MS. MOXLEY:  Objection, no showing of

8   personal knowledge.

9       A.   I do not know.

10      Q.   (BY MR. AHMAD)  You can't tell from that

11  language, right?

12      A.   No.  I don't even know what the head of subsea

13  hardware discipline really means.

14      Q.   Okay.  All right.  Next point, "Take

15  constructive feedback, seeking to understand and less of

16  rebuttals."  What does that mean?

17      A.   Those are the areas that Cornelia needs to

18  improve upon.

19      Q.   Okay.  How was she deficient in those areas?

20              MS. MOXLEY:  Objection, no showing of

21  personal knowledge.

22      A.   I personally have never witnessed that, so I

23  don't know specifically what happened in 2013 --

24      Q.   (BY MR. AHMAD)  Okay.

25      A.   -- to make her manager write that.

Kelly Rogers
January 6, 2017

1      Q.    All right.  So if you can't understand it,

2    Ms. Noel wouldn't be able to understand it, just looking

3    at that language, either, right?

4                MS. MOXLEY:  Objection, argumentative.

5      A.    I would disagree with that, because in 2013, I

6    wasn't even employed by Shell, whereas, Ms. Noel was

7    employed by this manager working on these projects, so I

8    would assume that she would understand what was written

9    in her performance review.

10     Q.    (BY MR. AHMAD)  Okay.  But when it comes to

11   counseling, you're not supposed to assume, you're

12   supposed to be specific.  We talked about that earlier.

13   And that's why you want specific feedback given to an

14   employee, so there is no misunderstanding.  "This is

15   where the deficiency is, this is where you have to

16   improve," right?

17     A.    I think --

18                MS. MOXLEY:  Objection, argumentative.

19     A.    I think that this is pretty specific.  "Take

20   constructive feedback."  That's an area of improvement.

21     Q.    (BY MR. AHMAD)  And how was she not taking

22   constructive feedback?

23                MS. MOXLEY:  Objection, no showing of

24   personal knowledge, and asked and answered.

25     Q.    (BY MR. AHMAD)  You can't tell from this

Kelly Rogers
January 6, 2017

114

1    language, right?

2         A.    From the one sentence, I can't tell what

3    happened throughout all of 2013.

4         Q.    Well, that's my point.  You state that "Shell

5    can make the argument that Ms. Noel has received more

6    than enough feedback," but you can't point to any

7    specific feedback that Ms. Noel has gotten, can you?

8              MS. MOXLEY:   Objection, argumentative and

9    mischaracterizes the witness' testimony.

10        Q.    (BY MR. AHMAD)  Can you point me to any

11   specific feedback that Ms. Noel received that you're

12   referencing when you make that statement?

13             MS. MOXLEY:   Objection, asked and

14   answered.

15        A.    "Take constructive feedback."

16        Q.    (BY MR. AHMAD)  You think that's specific?

17        A.    Yes.

18        Q.    Okay.  Then if it's specific, then tell me:

19   What was Ms. Noel supposed to do differently?

20        A.    Take constructive feedback.

21        Q.    What was she supposed to do differently?

22        A.    Take constructive feedback.

23        Q.    All right.  How was she not doing that?

24             MS. MOXLEY:   Objection, no showing of

25   personal knowledge.

Kelly Rogers
January 6, 2017

115

1      A.    I, personally, have no knowledge.

2      Q.    (BY MR. AHMAD)  Wait.  But --

3      A.    I think that feedback is clear.  I don't

4   have --

5      Q.    But you're saying --

6      A.    -- specific --

7      Q.    -- you have personal knowledge.

8            MS. MOXLEY:  Objection --

9      Q.    (BY MR. AHMAD)  You're saying that "Shell can

10  make the argument that Ms. Noel has received more than

11  enough feedback."  Those are your words, right?  You

12  wrote the e-mail?

13     A.    Yes.

14     Q.    Okay.  So you're saying, "I have personal

15  knowledge that Ms. Noel has received more than enough

16  feedback," right?

17           MS. MOXLEY:  Objection, mischaracterizes

18  the document, asked and answered.

19     Q.    (BY MR. AHMAD)  Isn't that what you're saying

20  in here?

21           MS. MOXLEY:  You're harassing my witness.

22     A.    No.

23           MS. MOXLEY:  You've asked this question

24  several times and she's answered it.  I know you don't

25  like her answer, but she has answered it.

Kelly Rogers
January 6, 2017

116

1      Q.    (BY MR. AHMAD)  Isn't that what you're saying

2  there?  Aren't you representing that you have personal

3  knowledge that Ms. Noel has received more than enough

4  feedback?

5              MS. MOXLEY:  Objection, asked and

6  answered.

7      Q.    (BY MR. AHMAD)  No?  I'm sorry.  What was your

8  answer?  You can answer.

9      A.    Can you repeat the question?  I'm a little

10  unclear as to what it is at this point.

11     Q.    You are representing in your e-mail that is

12  Exhibit 1 that you do have personal knowledge that

13  Ms. Noel has received more than enough feedback, right?

14             MS. MOXLEY:  Objection, mischaracterizes

15  the document, asked and answered.

16     Q.    (BY MR. AHMAD)  Is that right?

17     A.    What I am stating in Exhibit 1 is that based on

18  the documentation that I saw through both the GPAs and in

19  various e-mails that I reviewed that I believe that

20  Ms. Noel had received a lot of feedback on her

21  performance.

22     Q.    Okay.

23             MR. AHMAD:  I'm going to object as

24  nonresponsive.

25     Q.    (BY MR. AHMAD)  My question is a little

Kelly Rogers
January 6, 2017

117

1   different.  I'm not talking about a lot or -- let's be

2   very clear.  In your e-mail that is Exhibit 1 you are

3   representing that you have personal knowledge that

4   Ms. Noel has received more than enough feedback to

5   warrant termination?

6              MS. MOXLEY:  Objection, mischaracterizes

7   the document, asked and answered multiple times.

8        Q.   (BY MR. AHMAD)  True or false?

9              MS. MOXLEY:  Same objection.

10       A.   I believe I've already answered this question.

11       Q.   (BY MR. AHMAD)  Okay.  I don't believe so.  And

12   so your lawyer's made the objection, okay, and now you

13   can answer my question.

14              Are you representing in Exhibit 1 that you

15   have personal knowledge that Ms. Noel has received more

16   than enough feedback to warrant termination?

17              MS. MOXLEY:  Objection, asked and

18   answered.

19       Q.   (BY MR. AHMAD)  Yes or no?

20              MS. MOXLEY:  Same objection.

21       A.   I don't understand what you're getting at.  I

22   told you what I'm saying in this statement.

23       Q.   Well, then I'll rephrase.  Okay?  We'll work

24   through it.

25       A.   Okay.

Kelly Rogers
January 6, 2017

1    Q.    Aren't you stating in your e-mail that you have

2  personal knowledge of the feedback that Ms. Noel has

3  received?

4              MS. MOXLEY:  Objection, asked and

5  answered, mischaracterizes the document.

6    A.    I am saying that there is written documentation

7  that I had seen that shows that Ms. Noel received

8  feedback.

9    Q.    (BY MR. AHMAD)  Okay.  And so when you say that

10  "I don't have personal knowledge," that's not true,

11  because you did have personal knowledge.  You looked at

12  all the documentation.  We talked about that earlier,

13  right?

14              MS. MOXLEY:  Objection, mischaracterizes

15  the witness' prior testimony.

16    A.    What I said before is that I see these

17  statements that she has been given feedback because I

18  know that this is a performance review that she has seen.

19    Q.    (BY MR. AHMAD)  Uh-huh.

20    A.    However, I don't know exactly -- I can't

21  provide you specific examples of times where Ms. Noel did

22  not take constructive feedback, for instance, because I

23  was not there in her conversations with her manager in

24  2013.

25    Q.    Okay.  Let's not --

Kelly Rogers
January 6, 2017

119

1      A.    So, in that way, I don't have personal

2   knowledge.

3      Q.    Okay.  Without personal knowledge and without

4   investigating these issues, why would you just simply

5   recommend termination?

6              MS. MOXLEY:  Objection, asked and

7   answered.

8      A.    I explained before that the reason why I

9   recommended termination in this case is because, based

10  upon the e-mail documentation that I had seen, I thought

11  that was the most appropriate level of discipline, and

12  the reason why I did not suggest a performance

13  improvement plan was because I did not believe that,

14  based on what I had seen, there was any hope of a

15  performance improvement plan being successful, because,

16  as I said before, I believe that the first two things

17  that you need to have are the employee taking personal

18  responsibility for their role in the under-performance

19  and also wanting to improve.

20     Q.    (BY MR. AHMAD)  Okay.  Well, let me just make

21  sure that I'm clear, okay, because Shell has guidelines

22  that y'all are supposed to follow, right?

23             MS. MOXLEY:  Objection, vague.

24     A.    We have guidelines available to help us make a

25  decision on how to address a case.

Kelly Rogers
January 6, 2017

120

1  Q. (BY MR. AHMAD)  And how to counsel an employee,

2 right, and discipline an employee, right?

3  A. Yes.

4  Q. Okay.  And you're representing that with

5 everything you've seen that you're comfortable that the

6 guidelines were followed, is that a fair statement?

7  A. I am comfortable that we acted appropriately.

8    MR. AHMAD:  I'm going to object as

9 nonresponsive.

10  Q. (BY MR. AHMAD)  You are saying that you're

11 comfortable that the guidelines that Shell provides were

12 followed?

13    MS. MOXLEY:  Objection, vague.

14  A. If you're saying that we followed every single

15 step in the guideline, then the answer would be no,

16 because we did not follow every single step in the

17 guideline because I assumed that Alyssa and the other

18 people that ultimately decided the end result of this

19 action agreed that it was not -- that the action was

20 appropriate considering the circumstances.

21    Can we take a break?

22    MR. AHMAD:  I'm going to object as

23 nonresponsive.

24  Q. (BY MR. AHMAD)  Yeah, we can take a break in

25 just a minute --

Kelly Rogers
January 6, 2017

121

1      A.    Okay.

2      Q.    -- but I'm almost done with this line of

3   questioning.  Now, when you talk about that you can make

4   these arguments that Ms. Noel has received more than

5   enough feedback, you are referring to Shell's guidelines

6   in that regard; correct?

7                MS. MOXLEY:  Objection, vague, and

8   objection, mischaracterizes the document.

9      A.    No.

10     Q.    (BY MR. AHMAD)  What were you referring to

11  there when you state that Shell can make the argument

12  that she's received more than enough feedback?

13     A.    I am stating that I had seen that she had

14  received a lot of feedback, which is the intent of, say,

15  a performance improvement plan, at least part of the

16  intent.

17     Q.    Okay.  All right.

18                MR. AHMAD:  Yeah, we can take a break.

19                (Brief recess from 1:04 p.m. to 1:11 p.m.)

20                (Exhibit No. 7 marked for identification.)

21     Q.    (BY MR. AHMAD)  Okay.  Ms. Rogers, are you

22  ready to proceed?

23     A.    Yes.

24     Q.    Okay.  You've been handed Exhibit 7 to your

25  deposition.  Do you recognize that document?

Kelly Rogers
January 6, 2017

122

1      A.    Yes.

2      Q.    Okay.  We talked about this earlier.  This is

3  the Complainant Affidavit that Ms. Noel had created

4  talking about her concerns?

5      A.    Yes.

6      Q.    Okay.  When you were looking at the

7  documentation, putting together your discipline summary,

8  you don't know what other documentation relating to

9  Ms. Noel's performance was out there, right?

10     A.    Go.

11     Q.    You just looked at the documentation that was

12  given to you, right?

13     A.    Yes.  And what was in Shell People, our system,

14  which would be these GPA --

15     Q.    Right.

16     A.    -- write-ups.

17     Q.    And so you had access to get into the Shell

18  system and look at the annual performance evaluations?

19     A.    Yes.

20     Q.    Right.  And then you looked at the

21  correspondence and other documentation that was given to

22  you, right?

23     A.    Yes.

24     Q.    But when you put together the discipline

25  summary, and even sitting here today, you don't know what

Kelly Rogers
January 6, 2017

123

```
 1   other documents are out there that reflect Ms. Noel's job
 2   performance, right?
 3        A.    That's correct.
 4        Q.    Okay.  And so you don't know if there are other
 5   e-mails that Ms. Noel wrote back to management that you
 6   did not get a chance to see, right?
 7        A.    Yes.
 8        Q.    Okay.  Did you ever consider contacting
 9   Ms. Noel and asking her whether there are any other
10   relevant documents that you ought to review?
11              MS. MOXLEY:  Objection, asked and
12   answered.
13        A.    No.
14        Q.    (BY MR. AHMAD)  Why not?
15        A.    Because that would be an investigation, and I
16   was not investigating this concern or this case.
17        Q.    Okay.  You did not view this as an
18   investigation?
19        A.    Not for me, no.
20        Q.    Okay.  What did you view it as?
21              MS. MOXLEY:  Objection, asked and
22   answered.
23        A.    Synthesizing and summarizing documents.
24        Q.    (BY MR. AHMAD)  Okay.  So, what, a task or an
25   assignment?
```

Kelly Rogers
January 6, 2017

124

1      A.    Yes.  A project.

2      Q.    A project.  Okay.  And so based upon the

3  project that you completed, you made a recommendation on

4  termination?

5      A.    Yes.

6      Q.    All right.  Typically, within Shell,

7  termination recommendations are not made until there is

8  an investigation that's done, is that fair?

9           MS. MOXLEY:  Objection, vague, and

10  objection, lack of personal -- lack of showing of

11  personal knowledge.

12     Q.    (BY MR. AHMAD)  Well --

13     A.    I can't speak generally for typically at Shell.

14     Q.    Sure.  Sure.  Let me just address that.  You

15  understand that termination decisions are not made

16  lightly at Shell?

17     A.    Yes.

18     Q.    Okay.  And if there is going to be a

19  termination recommendation made, that will typically

20  follow an investigation, is that right?

21           MS. MOXLEY:  Objection, vague; objection,

22  lack of showing of personal knowledge.

23     A.    It totally depends on each individual case.

24     Q.    (BY MR. AHMAD)  Okay.  So sometimes there is an

25  investigation that gives rise to a termination decision;

Kelly Rogers
January 6, 2017

125

 1    other times, there is not?

 2         A.    Yes.

 3         Q.    Okay.  And that's the case with your

 4    recommendation for Ms. Noel's termination, it was one of

 5    those cases that a recommendation was made without an

 6    investigation, right?

 7                   MS. MOXLEY:  Objection, vague; objection,

 8    mischaracterizes witness' testimony.

 9         A.    I was under the impression, your last question,

10    that when you said a termination recommendation you meant

11    actually terminating an employee.  I see there as being a

12    difference between actually terminating the employee and

13    recommending that as a potential course of action.

14                   MR. AHMAD:  Okay.  I'm going to object as

15    nonresponsive.

16         Q.    (BY MR. AHMAD)  I understand what you're

17    saying, but my question is simply that the recommendation

18    that you made, that recommendation came without an

19    investigation.

20         A.    Without me personally investigating, yes.

21         Q.    Okay.  Well, and it came without an

22    investigation at all, because you didn't even look at any

23    other investigation when you recommended termination, you

24    just looked at a set amount of documents that were handed

25    to you.

Kelly Rogers
January 6, 2017

126

1      A.    Yes.  Which did include an investigation

2   summary from the complaint that Ms. Noel put in Nigeria,

3   but beyond that, yes.

4      Q.    Okay.  All right.  Why were you sent an

5   original version of the complaint that's reflected on

6   Exhibit 7?

7      A.    Why was I sent the e-mail on February 25th?

8      Q.    Correct.

9      A.    I don't necessarily recall specifics, but I

10  believe it was for me to read through and see if there

11  is anything that I needed to add to my time line,

12  additional context, perhaps, of some of the e-mails,

13  et cetera.

14     Q.    Did you read the document after it was sent to

15  you, do you recall?

16     A.    Yes.

17     Q.    Did you make any revisions to your time line

18  after you received the document?

19     A.    I don't remember.

20     Q.    All right.  In the investigation summary, we

21  were previously talking about any specific feedback that

22  Ms. Noel was given that you've referenced in your

23  statement on Exhibit 1.  Can you point me to any other

24  specific feedback in the document other than the three

25  bullet points you mentioned before?

Kelly Rogers
January 6, 2017

127

1       A.      Previously, I mentioned the various comments in

2    the 2014 GPA.  On Page 6 of the document under

3    "Employee's discipline history," the first row says,

4    "Jane Zhang coaches Cornelia on her poor behaviors,

5    including her behaviors during their meeting where she

6    spent most of the meeting looking at the computer."

7       Q.      Do you know what Ms. Noel was doing looking at

8    the computer?

9       A.      No.

10      Q.      What was she supposed to be doing instead of

11   looking at her computer?

12              MS. MOXLEY:  Objection, lack of showing

13   personal knowledge.

14      Q.      (BY MR. AHMAD)  Do you know?

15      A.      No.

16      Q.      Okay.  All right.  Anything else?

17      A.      Are you asking me to provide additional

18   examples?

19      Q.      Uh-huh.

20      A.      On the next bullet, "Robert Chin provides

21   Cornelia with feedback from her communication skills

22   during the 2011 mid year review."  Further down, on

23   May 8th, "Robert Chin coaches Cornelia to communicate

24   with stakeholders and to not jump to negative

25   conclusions."

Kelly Rogers
January 6, 2017

128

1    Q.    What negative conclusions did Ms. Noel jump to?

2              MS. MOXLEY:  Objection, lack of showing

3    personal knowledge.

4    A.    I do not know.

5    Q.    (BY MR. AHMAD)  And how did Ms. Noel not

6    communicate with stakeholders?

7              MS. MOXLEY:  Objection, lack of showing

8    personal knowledge.

9    A.    I do not know.

10   Q.    (BY MR. AHMAD)  Then how do you know that that

11   was sufficient feedback for Ms. Noel to warrant

12   termination?

13   A.    It is my opinion that it was.

14   Q.    Okay.  Based on just your speculation?

15   A.    Based on reading the e-mails and seeing what

16   the e-mails said, that was my opinion.

17   Q.    Well, you summarized the e-mails, right,

18   sometimes?

19   A.    Yes.

20   Q.    There is no summary of the feedback given on

21   those two examples, right?

22   A.    I did not put it in the summary performance

23   issue.

24   Q.    Okay.  So it's fair to say that you may not

25   know what the specific performance issue was with respect

Kelly Rogers
January 6, 2017

1   to those points, right?

2                    MS. MOXLEY:   Objection, argumentative.

3       A.    I do not know now.  I clearly understood what I

4   meant two years ago, but I don't recall, because I don't

5   remember, specifically, what it said in the e-mail.

6       Q.    (BY MR. AHMAD)   Okay.   Any other specific

7   instances of feedback that you believe Ms. Noel received

8   that would warrant termination?

9       A.    Every single one of these examples in the

10  employee discipline history, the reason why I included it

11  in there is because I felt that it was an example of her

12  being given feedback.  I can't remember all of the

13  specifics.  In retrospect, I probably should have put

14  more of them in the summary, but I did not.

15      Q.    Did you know that one of Ms. Noel's primary

16  concerns was that her performance was being attacked, but

17  she wasn't given any specifics?

18      A.    I don't recall that.

19      Q.    Okay.  You do recall that in Ms. Noel's

20  statement that you were provided a copy of in February --

21  by the way, did you have this statement when you put

22  together the discipline summary?

23      A.    I don't recall.

24      Q.    Okay.  You do understand that within the

25  statement Ms. Noel refutes the claims that are made about

Kelly Rogers
January 6, 2017

130

1    her performance, right?  You understood that when you

2    read it?

3        A.    What page are you looking at?

4        Q.    Well, just go to page -- on the bottom right it

5    should be 3091, Shell 3091.  Do you see that?

6        A.    Yes.

7        Q.    So I'm just looking at the bottom, Point A,

8    "False Claim No. 7.  Top areas for improvement."

9    Ms. Noel goes through in very explicit detail and refutes

10   the attacks that have been made on her performance over

11   the years, right?

12            MS. MOXLEY:  Objection, mischaracterizes

13   the document.

14       Q.    (BY MR. AHMAD)  Isn't that what's going on

15   here?

16            MS. MOXLEY:  Same objection.

17       Q.    (BY MR. AHMAD)  Or did you not read it in that

18   much detail?

19       A.    I don't know because it was two years ago.

20       Q.    Okay.  Fair enough.  This is not a document

21   that you reviewed to prepare for your deposition?

22       A.    I saw it, but I did not read it word for word.

23       Q.    All right.  And why did you see it?

24            MS. MOXLEY:  Objection.  You're getting

25   into attorney/client information.  So I'll instruct you

Kelly Rogers
January 6, 2017

1    not to answer.

2                    MR. AHMAD:  Oh, is Ms. Snider a lawyer?

3                    MS. MOXLEY:  Oh, why did she see it when?

4                    MR. AHMAD:  In February of 2015.

5                    MS. MOXLEY:  Okay.  You can answer.

6    Q.    (BY MR. AHMAD)  Why was this given to you?

7    A.    Oh, I've said before that I think the

8    purpose -- I think, from what I remember, the purpose was

9    for me to review it and see if there was any additional

10   context I needed to add to my time line.

11   Q.    Okay.  Did you assist at all in investigating

12   any of Ms. Noel's concerns?

13   A.    My only -- my only -- the only thing I did as

14   part of the investigation is as a scribe, to take notes

15   at, you know, two meetings, act as a scribe.

16                    (Exhibit No. 8 marked for identification.)

17   Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, that is

18   Exhibit 8 to your deposition.  Do you recognize that

19   document?

20   A.    Yes.

21   Q.    Do you know why you were provided a copy of

22   this in March of 2015?

23   A.    Yes.  I believe that Jamie had not previously

24   sent this information, so she was sending it to make sure

25   that Alyssa and I were aware of it.

Kelly Rogers
January 6, 2017

132

1      Q.    Okay.  All right.  If you look on the second

2   page, there is an e-mail from Debo on June 17th, 2014 at

3   8:37, do you see that?

4      A.    Yes.

5      Q.    Who is that that he's writing to?  Do you know

6   how to pronounce that?

7      A.    No.

8      Q.    Okay.

9      A.    I believe, based on context, that it would have

10  been another stakeholder in Nigeria.  "SNEPCO" means

11  Nigeria.

12     Q.    Okay.  All right.  And Debo states, "Seeking

13  your concurrence; I'm looking at a transfer IPF of .8 or

14  .9 for Cornelia," do you see that?

15     A.    Yes.

16     Q.    Okay.  What does that mean?

17     A.    When an employee transfers between countries,

18  they need to get an IPF for the period of the year that

19  they worked in the other country.

20     Q.    Okay.

21     A.    And that's what they are trying to determine.

22     Q.    All right.  And Jerry Jackson, according to the

23  most recent e-mail before it's forwarded to you, says

24  that it looks like they must have gone with .8, right?

25     A.    Yes.

Kelly Rogers
January 6, 2017

133

1     Q.    All right.  So for the first half of 2014,
2   Ms. Noel got a .8?
3     A.    Yes.  The transfer IPF was .8 --
4     Q.    Okay.
5     A.    -- as this document indicates.  I don't know if
6   that necessarily was the case because --
7     Q.    Well, you don't have any reason to believe
8   differently, right?
9     A.    Yeah, I don't have any reason to believe
10  differently.
11    Q.    Okay.  And for the year of 2014, for the entire
12  year, Ms. Noel received a .5?
13    A.    That is correct.
14    Q.    How is that possible?  How did that happen, do
15  you know?
16    A.    IPFs are just determined every year in the
17  departments.  We call them IPR sessions.  So it's an
18  individual performance, like, review session where every
19  employee's performance is ranked comparative to their
20  peers within the department and assigned an appropriate
21  IPF.
22    Q.    All right.  Well, if Ms. Noel had a .8 for the
23  first half of the year, how did she end up with a .5 for
24  the entire year?
25            MS. MOXLEY:  Objection, lack of showing

Kelly Rogers
January 6, 2017

1    personal knowledge.

2         Q.    (BY MR. AHMAD)  Doesn't that sound odd?

3              MS. MOXLEY:  Objection, argumentative.

4         A.    On your first question, I wasn't at the IPR

5    session for this department, so I can't really speak to

6    specifically why she was given a .5.

7         Q.    (BY MR. AHMAD)  Okay.

8         A.    However, for greater context, transfer IPFs

9    are -- there is no budget.  You can give anyone -- well,

10   during our normal IPR sessions, all the IPFs for the

11   department need to average to a particular number, which,

12   you know, puts constraints and makes it -- while transfer

13   IPFs, there is no constraints.

14             So, typically, I would -- typically,

15   transfer IPFs are higher than end-of-year IPFs, for that

16   reason.

17        Q.    Doesn't that strike you as odd that .8 for the

18   first half of the year would lead to a .5 for the entire

19   year?

20             MS. MOXLEY:  Objection, argumentative.

21        A.    I would say I'm not surprised that the transfer

22   IPF is higher than the end-of-year IPF, for the reasons I

23   just stated, and I can't specifically speak to why she

24   was given a .5.

25        Q.    (BY MR. AHMAD)  Okay.  Is .8 -- can you tell

Kelly Rogers
January 6, 2017

135

1    whether .8 shows good performance or bad performance or

2    average performance, or do you have no way of knowing

3    based on just that one score?

4        A.    It would be difficult to say based on that one

5    score.

6        Q.    Did you talk to anybody in Nigeria to determine

7    what the .8 represented?

8        A.    No.

9        Q.    Okay.  What did you think when you received

10   that?

11       A.    Nothing.  It's not terribly surprising.

12       Q.    Okay.

13                   (Exhibit No. 9 marked for identification.)

14       Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, that is

15   Exhibit 9 to your deposition.  Exhibit 9 is an e-mail

16   chain, right?

17       A.    Yes.

18       Q.    Let's look at the second-most-recent e-mail.

19   It's an e-mail from Ms. Snider to IB and CCing you?

20       A.    Yes.

21       Q.    All right.  Ms. Snider states, "IB, please

22   confirm you'll be able to get us the information

23   tomorrow.  We are trying to prepare for a conversation

24   with her prior to the launch of MOR."  Did I read that

25   correctly?

Kelly Rogers
January 6, 2017

136

1      A.    Yes.

2      Q.    Okay.  What information were y'all waiting on?

3      A.    We were waiting -- in the bottom e-mail, Alyssa

4   is asking IB for any documents that he has related to

5   Cornelia's performance history and asks to have them by

6   January 7th.  By January 6th we still hadn't heard back

7   from him, so she was asking again.  That's how I

8   interpret this.

9      Q.    Okay.  So it's the documentation about her

10  performance history in Nigeria?

11     A.    Yes.

12     Q.    All right.  When she states that y'all were

13  trying to prepare for a conversation with her, what was

14  the conversation that y'all were preparing to have with

15  her?

16     A.    I don't believe I was preparing to have a

17  conversation with her.  I believe Alyssa was preparing to

18  have a conversation with her, so I can't say for certain.

19  But it does say something about "MOR," so that's the only

20  guess I have.

21     Q.    All right.  Was that the conversation that

22  Ms. Snider was preparing to have to terminate Ms. Noel?

23           MS. MOXLEY:  Objection, asked and

24  answered; objection, lack of showing a personal

25  knowledge.

Kelly Rogers
January 6, 2017

137

1      Q.    (BY MR. AHMAD)  I mean, this is six days after

2  you provided your recommendation to terminate, right?

3      A.    Yes.

4      Q.    Based on the performance documentation that she

5  had given to you previously?

6      A.    Yes.

7      Q.    And she states that she is waiting on

8  additional performance documentation and that she was

9  preparing to have a conversation with her, right?

10     A.    Yes.

11     Q.    You've mentioned "MOR."  What does that mean,

12  that "prior to the launch of MOR"?

13             MS. MOXLEY:  Objection, lack of showing a

14  personal knowledge.

15     A.    I don't know what Alyssa was specifically

16  planning on discussing with Cornelia at that meeting

17  because I was not present.

18     Q.    (BY MR. AHMAD)  Okay.

19             MR. AHMAD:  I'm going to object as

20  nonresponsive.

21     Q.    (BY MR. AHMAD)  What does that mean, "prior

22  to the launch" or "the launch of MOR"?  What does that

23  mean?

24     A.    "Launch of MOR" would be the first day that the

25  job postings were posted on MOR, when all the jobs that,

Kelly Rogers
January 6, 2017

138

1   you know, Cornelia could potentially be applying on would

2   be visible.

3       Q.    Okay.  Do you know why Ms. Snider was trying to

4   have the conversation with Ms. Noel before the launch of

5   MOR?

6       A.    No.

7       Q.    Can you think of a reason why?

8             MS. MOXLEY:  Objection, calls for

9   speculation.

10      A.    Yeah.  I -- no.

11      Q.    (BY MR. AHMAD)  You can't think of any reason

12  why she would want to do it?

13      A.    I don't know what Alyssa's intent in having the

14  meeting was.

15      Q.    No, I'm not asking for intent.

16      A.    So then I can't speculate because I really have

17  no idea what the intent was, so I can't speculate why it

18  was on that day.

19      Q.    No.  Can you think of any reason why she would

20  want to have the conversation before the launch of MOR?

21      A.    No.

22      Q.    Can you think about why the launch of MOR might

23  be significant?

24            MS. MOXLEY:  Objection, calls for

25  speculation.

Kelly Rogers
January 6, 2017

139

1      A.    If Cornelia was applying for jobs, that would

2  make the launch of MOR important for her, but I don't

3  know how that ties into this particular conversation.

4      Q.   (BY MR. AHMAD)  Okay.  You would say it's a

5  fair interpretation that Ms. Snider was going to let

6  Ms. Noel know that she was being let go, right?

7              MS. MOXLEY:  Objection, argumentative.

8      A.    No, I would actually take the exact opposite

9  approach.  Because if Ms. Noel was preparing to apply for

10  MOR, hence, why part of the launch of MOR was important,

11  then she would not be terminated, she would be looking

12  for another job.

13     Q.    (BY MR. AHMAD)  Okay.  I think I understand

14  what you're saying.  So a fair interpretation is that

15  Ms. Noel was going to be told that she was no longer

16  going to have per position, but she should get on the MOR

17  and see what jobs were out there?

18              MS. MOXLEY:  Objection, argumentative.

19     Q.    (BY MR. AHMAD)  Does that seem to be a fair

20  interpretation of the document?

21              MS. MOXLEY:  Objection, argumentative,

22  calls for speculation, lack of showing a personal

23  knowledge.

24     A.    No, I wouldn't say that's fair, because I have

25  no idea what the meeting was about, what had been

Kelly Rogers
January 6, 2017

140

```
 1    communicated to Cornelia, what was going to be

 2    communicated to Cornelia.

 3         Q.    (BY MR. AHMAD)  But you're copied on the

 4    e-mail.

 5         A.    Yes.

 6         Q.    And y'all weren't talking?

 7         A.    I was copied on the e-mail because I was the

 8    one that was waiting for the documents from IB.

 9         Q.    Okay.

10         A.    So by copying me, I believe the idea would be

11    that IB would reply all with the documents and cut out

12    the middleman.

13         Q.    Got you.

14                    (Exhibit No. 10 marked for

15    identification.)

16         Q.    (BY MR. AHMAD)  All right.  Ms. Rogers, that is

17    Exhibit 10 to your deposition.  It's an e-mail from

18    Ms. Allen to Alyssa Snider and yourself; correct?

19         A.    Yes.

20         Q.    All right.  It's a forward of an earlier e-mail

21    chain?

22         A.    Yes.

23         Q.    Okay.  Do you know why you were provided this

24    in March of 2015?

25         A.    I believe it would be the same reason as
```

Kelly Rogers
January 6, 2017

141

1    Exhibit 8, that Jamie had not provided us these documents

2    before, so she was sending it to Alyssa and I to make

3    sure that we were aware.

4         Q.    All right.  And if you look on the third page,

5    the date of the e-mail actually will be on the second

6    page, but --

7                   MS. MOXLEY:  I think you have to go back

8    to the first page for the date.

9                   THE WITNESS:  Yeah.

10                  MR. AHMAD:  Yeah.

11        Q.    (BY MR. AHMAD)  Ms. Noel writes to IB in

12   February of 2014, right?

13        A.    Yes.

14        Q.    On the third page Ms. Noel states that, "This

15   is a result of gender bias and bullying that's continuing

16   to go on, is that right?

17                  MS. MOXLEY:  Where are you?

18                  THE WITNESS:  I think the top here.

19        A.    "The way in which this matter is being dealt

20   with suggests gender bias" --

21                  MR. AHMAD:  Third page.

22                  MS. MOXLEY:  Third page.

23        A.    -- and bullying."

24        Q.    (BY MR. AHMAD)  Did you read this when you

25   received it?

Kelly Rogers
January 6, 2017

142

1    A.    Yes.

2    Q.    Okay.  Did you have a discussion with anybody

3  in Human Resources or did you have a discussion with

4  anybody at Shell about the content of Exhibit 10?

5    A.    I don't believe so.

6    Q.    All right.  Why not?

7    A.    If I was the one investigating this case, I

8  would have taken further actions; however, Alyssa was

9  investigating this and she also received it.

10    Q.    Well, Alyssa, you're referring to

11  Alyssa Snider?

12    A.    Yes.

13    Q.    Yes.  Ms. Snider involved you in the

14  investigation, right?

15    A.    Only in one or two or so meetings as a scribe.

16  I would not characterize that as a deep involvement, by

17  any means.

18    Q.    Recommending termination is not a deep

19  involvement?

20         MS. MOXLEY:  Objection, argumentative.

21    A.    I was asked to summarize documents, and I

22  provided recommendation, as I said before, because that

23  was in the template that I was provided.

24    Q.    (BY MR. AHMAD)  By Ms. Snider?

25    A.    Yes.

Kelly Rogers
January 6, 2017

143

1    Q.    Okay.  And so Ms. Snider was asking you for a

2  recommendation on Ms. Noel's employment, right?

3    A.    She did not specifically ask me for a

4  recommendation.  She asked me to summarize and organize

5  the documents.  I took it upon myself to add a

6  recommendation.  And the reason I did that was because it

7  was in the template.

8    Q.    And you followed the template?

9    A.    Yes.

10    Q.    And you did that because Ms. Snider wanted you

11  to follow the template?

12         MS. MOXLEY:  Objection, lack of showing

13  personal knowledge.

14    A.    I did that because it was easiest to just

15  follow the template.

16    Q.    (BY MR. AHMAD)  Well, that's the template that

17  Ms. Snider provided you, right?

18    A.    Yes.

19    Q.    Okay.  I think I asked you earlier, but do you

20  know why Ms. Noel was ultimately terminated?

21    A.    Not specifically.

22    Q.    Did you ever hear that Ms. Noel's position was

23  eliminated?

24    A.    I don't recall.

25    Q.    Okay.  Did you know what Ms. Noel's position

Kelly Rogers
January 6, 2017

144

1    was at the time?

2        A.    She was global SURF projects lead.

3        Q.    What does that mean?  Do you know what she did

4    as global SURF projects lead?

5        A.    I don't recall.  I believe I had a better

6    understanding at the time, but I can't say specifically

7    what that means.

8        Q.    Did you ever reach a conclusion based upon your

9    own investigation whether Ms. Noel was discriminated

10   against or retaliated against?

11       A.    Based upon my reading of the documents, I did

12   not believe that there was evidence to show that.  Of

13   course, that doesn't mean that it doesn't exist.  Based

14   on what I saw, I didn't believe that I had seen evidence

15   to show that.

16       Q.    Okay.  So the evidence might have existed, you

17   just didn't see it?

18       A.    That is possible.

19       Q.    Okay.  And so let's make sure that we are on

20   the exact same page here, because this is an important

21   question.

22             Did you personally investigate whether

23   Ms. Noel was discriminated against or retaliated against?

24   And just so we're clear, when I talk about investigate,

25   I'm referring to the standard protocol that you described

Kelly Rogers
January 6, 2017

1  earlier as far as investigation.  Interviewing witnesses,

2  you know, looking at all the relevant documents.  I think

3  we have talked numerous times that the documents that you

4  looked at in order to prepare your discipline summary,

5  that was not an investigation, right?

6      A.    Correct.

7      Q.    Okay.

8      A.    So, no, I did not investigate it.

9      Q.    Okay.  So just so the record is clear, I'm

10  going to rephrase my question in just a second.

11      A.    Okay.

12      Q.    But you would expect that before an employee is

13  terminated that if there are allegations of performance

14  issues that those allegations would be investigated,

15  right?  In other words, a manager comes and just says

16  that there are performance issues, that's not going to do

17  it in and of itself.  Human Resources is going to want a

18  little bit more than that, fair?

19              MS. MOXLEY:  Objection, vague and

20  ambiguous.

21              MR. AHMAD:  That was kind of vague.

22              MS. MOXLEY:  I mean, I'm not even sure

23  what the question was.

24              MR. AHMAD:  It was.  Yeah, I'm going to --

25      A.    I would say that performance issues are --

Kelly Rogers
January 6, 2017

146

```
 1              MS. MOXLEY:  Hang on.
 2      Q.    (BY MR. AHMAD)  Yeah, don't even try to answer
 3   it.  You don't know what you're answering, so I'm going
 4   to rephrase it.
 5              Well, let's set aside the performance
 6   issues.  If an employee reports that they feel like they
 7   are being discriminated against and/or retaliated
 8   against, in order to make a determination about whether
 9   those allegations are true or not, from a Human Resources
10   perspective, the allegations should be investigated in
11   accordance with the protocol that you mentioned earlier,
12   right?
13      A.    Correct.
14      Q.    Okay.  And so, from a Human Resources
15   perspective, you would not want to see any kind of
16   conclusion on those allegations until an investigation
17   has been done, a real investigation, right?
18      A.    I would not want any action taken until an
19   investigation has been done.
20      Q.    What do you mean by that, "action taken"?
21      A.    I would not want discipline to be enacted
22   without a formal investigation.
23      Q.    And when you talk about discipline in this
24   context, you're talking about discipline against the
25   person who is accused of discriminating and/or
```

Kelly Rogers
January 6, 2017

147

1  retaliating, right?

2      A.    Either.  Either party.

3      Q.    Okay.

4      A.    So you say --

5      Q.    Yeah.

6      A.    I think I already answered the question.

7      Q.    You would want to see, if there is a report of

8  discrimination and/or retaliation from a Human Resources

9  perspective, you would want to ensure that those

10 allegations are investigated, right?

11     A.    Yes.

12     Q.    Okay.  You would not feel comfortable if

13 allegations were made and they were just never

14 investigated?  That would be bad?

15     A.    That is correct.

16     Q.    All right.  And so, from your perspective, you

17 know that Ms. Noel raised allegations of discrimination

18 and/or retaliation?

19             MS. MOXLEY:  Objection, vague.

20     Q.    (BY MR. AHMAD)  Right?  I mean, sitting here

21 today, you know that, based on everything you've seen in

22 the documents, right?

23     A.    Based on the affidavit, et cetera.

24     Q.    Yes.

25     A.    Yes.

Kelly Rogers
January 6, 2017

148

```
 1      Q.    And not just as part of this lawsuit.  I mean,
 2  you knew that back at the time when Ms. Noel was still
 3  employed at Shell, you knew that she had raised
 4  allegations of discrimination and retaliation, right?
 5              MS. MOXLEY:  Objection, vague.
 6      A.    I had read the e-mails where she brings up
 7  various concerns, yes.
 8      Q.    (BY MR. AHMAD)  Okay.  Were you aware that one
 9  of the concerns that Ms. Noel raised was that her 2014
10  performance evaluation and her 2014 IPF were based on
11  impermissible discrimination and retaliation?
12              MS. MOXLEY:  Objection, vague.
13      A.    I don't recall.
14      Q.    (BY MR. AHMAD)  Okay.  Can you tell me -- well,
15  so you, personally, never investigated Ms. Noel's
16  allegations of discrimination and retaliation, right?
17              MS. MOXLEY:  Objection, asked and answered
18  several times.
19      A.    No.
20      Q.    (BY MR. AHMAD)  Do you know who did?
21              MS. MOXLEY:  Objection, asked and answered
22  several times.
23      A.    Alyssa Snider.
24      Q.    (BY MR. AHMAD)  Okay.  And you're certain of
25  that, that she investigated allegations of discrimination
```

Kelly Rogers
January 6, 2017

149

```
 1   and retaliation raised by Ms. Noel?
 2              MS. MOXLEY:  Objection, asked and
 3   answered.
 4       A.    I am certain that she investigated concerns.  I
 5   can't speak to what specific concerns, but I have faith
 6   that she would have investigated all concerns that had
 7   been brought to her attention.
 8       Q.    Okay.  Let's take faith and throw it out the
 9   window.
10       A.    Yeah.  So I can't -- I don't know for sure
11   that, yes, she investigated claims of XYZ --
12       Q.    Okay.
13       A.    -- but I know she did investigate --
14       Q.    Something.
15       A.    Yes.
16       Q.    Okay.  Well, let's -- yeah, we don't want to
17   deal with something and we don't want to deal with faith
18   or speculation.  I just want your personal knowledge.
19   And just so we're clear, I'm going to make this very
20   simple:  Do you know who investigated -- do you have
21   personal knowledge of who investigated Ms. Noel's
22   complaints of discrimination and retaliation?
23              MS. MOXLEY:  Objection, vague; objection,
24   asked and answered.
25       A.    Again, I know that Alyssa Snider investigated
```

Kelly Rogers
January 6, 2017

150

1  concerns.  What specific concerns were investigated, I do
2  not have personal knowledge of.
3      Q.    (BY MR. AHMAD)  Okay.
4             MR. AHMAD:  And I would object as
5  nonresponsive.
6      Q.    (BY MR. AHMAD)  You made that very clear.
7      A.    Yeah.
8      Q.    But what I'm talking about are Ms. Noel's
9  specific complaints of discrimination and retaliation.
10            Do you know, can you give me a name, do
11  you know who investigated those allegations?
12            MS. MOXLEY:  Objection, vague.
13     A.    I believe I already answered this question that
14  Alyssa Snider investigated.
15     Q.    (BY MR. AHMAD)  Okay.  So you're telling me
16  that Ms. Snider investigated Ms. Noel's claims of
17  discrimination and retaliation?
18            MS. MOXLEY:  Objection --
19     Q.    (BY MR. AHMAD)  That's what you're saying under
20  oath?
21     A.    I explained before that I don't know what
22  specific concerns she investigated.
23     Q.    Okay.
24     A.    So I can't -- if you're asking me -- I don't
25  have personal knowledge of what specific concerns were

Kelly Rogers
January 6, 2017

1    investigated.

2         Q.    Okay.

3         A.    I know there was an investigation that occurred

4    by Alyssa Snider.  If you're asking me for "Do you 100

5    percent know that Alyssa Snider investigated claims of

6    discrimination," I cannot answer you.

7         Q.    Okay.

8         A.    Because I don't know.

9         Q.    And I appreciate that, but Human Resources is

10   made up of more than just Alyssa Snider and yourself,

11   right?

12        A.    Yes.

13        Q.    Okay.  So I'm not talking about just

14   Alyssa Snider.  I'm talking about anybody.  Okay?

15             So can you tell me the name of anybody who

16   investigated Ms. Noel's complaints of discrimination and

17   retaliation?

18             MS. MOXLEY:  Objection, vague; objection,

19   asked and answered.

20        A.    No.

21        Q.    (BY MR. AHMAD)  Okay.  How do you know that

22   Ms. Snider investigated some concerns of Ms. Noel's?

23        A.    Because I was a scribe in a meeting where

24   Alyssa and Jamie Allen were more or less interviewing

25   witnesses.

Kelly Rogers
January 6, 2017

152

```
 1      Q.    Okay.  And so you know a general substance of
 2   what they were investigating, what Ms. Snider was
 3   investigating, right?
 4      A.    In the particular meeting that I sat in on was
 5   about specifically the Nigeria time frame that Cornelia
 6   was in Nigeria.
 7      Q.    Okay.  Do you have personal knowledge of what
 8   the results of Ms. Snider's investigation was?
 9      A.    No.
10      Q.    All right.  Did you ever ask?
11      A.    I don't recall.  But I believe that the only
12   thing I would have asked Alyssa would be more along the
13   lines of, "Do you need anything else from me on this
14   case?"
15      Q.    Okay.
16      A.    Which the answer was "No."
17      Q.    All right.  And so from a, from a Human
18   Resources perspective, you cannot testify under oath that
19   Shell's position is that Ms. Noel was not discriminated
20   against?
21      A.    No.
22      Q.    And you cannot testify under oath that Shell's
23   position is that Ms. Noel was not retaliated against?
24      A.    No.
25      Q.    In order to make that determination, there is
```

Kelly Rogers
January 6, 2017

153

1    more information that you would need in addition to what

2    you reviewed in putting together Exhibit 3?

3         A.    That is correct.

4         Q.    And there is more information that you would

5    need in addition to what you reviewed after you put

6    together Exhibit 3, right?

7         A.    That's correct.

8         Q.    In order to investigate, would you agree that

9    one of the key components to investigating is talking to

10   the person who is making the complaint?

11        A.    Yes.

12             MS. MOXLEY:  Objection, argumentative,

13   asked and answered.

14        Q.    (BY MR. AHMAD)  And would you agree that one of

15   the key components to an investigation is talking to the

16   person who is accused of the unlawful conduct?

17             MS. MOXLEY:  Objection, asked and

18   answered.

19        A.    Yes.

20        Q.    (BY MR. AHMAD)  All right.  There are things

21   that you just cannot get from a document or an e-mail, is

22   that fair?

23             MS. MOXLEY:  Objection, argumentative.

24        A.    Body language, et cetera, yes.

25        Q.    (BY MR. AHMAD)  Okay.  All right.

Kelly Rogers
January 6, 2017

154

1                    MR. AHMAD:  I'll pass the witness.

2                    MS. MOXLEY:  We reserve until the time of

3    trial.

4                    MR. AHMAD:  All right.

5                    MS. MOXLEY:  And we'll read and sign.  I

6    think I said that earlier.

7                    (Deposition concluded at 1:53 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kelly Rogers
January 6, 2017

155

1                          CHANGES AND SIGNATURE

2        PAGE    LINE    CHANGE        REASON

3        _____

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

Kelly Rogers
January 6, 2017

1       I, KELLY ROGERS, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5

6

7                           _____

                            KELLY ROGERS

8

9

10

THE STATE OF TEXAS)

11

COUNTY OF _____)

12

        Before me, _____, on this day personally

13

appeared _____, known to me to be the

14

person whose name is subscribed to the foregoing

15

instrument and acknowledged to me that they executed the

16

same for the purposes and consideration therein

17

expressed.

18

        Given under my hand and seal of office this _____

19

day of _____, 2017.

20

21                          _____

                            Notary Public in and for

22                          The State of Texas

23

24

25

Kelly Rogers
January 6, 2017

157

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    CORNELIA NOEL                    *
           Plaintiff                  *
 4                                     *
      v.                               *          CIVIL ACTION NO.
 5                                     *           4:15-cv-01087
                                       *
 6    SHELL OIL COMPANY, SHELL         *
      INTERNATIONAL E&P, INC.,         *
 7    and DEBO OLADUNJOYE              *
           Defendant                  *
 8
 9                   REPORTER'S CERTIFICATION
                     DEPOSITION OF KELLY ROGERS
10                   TAKEN ON JANUARY 6, 2017

11           I, MIKE R. RASKA, a Certified Shorthand Reporter,

12    hereby certify to the following:

13           That the witness, KELLY ROGERS, was duly sworn by

14    the officer and that the transcript of the oral

15    deposition is a true record of the testimony given by the

16    witness;

17           That the original deposition was delivered to

18    _____.

19           That a copy of this certificate was served on all

20    parties and/or the witness shown herein on _____.

21           I further certify that pursuant to FRCP Rule 30

22    (f)(1) that the signature of the deponent:

23           _____ was requested by the deponent or a party

24    before the completion of the deposition and that the

25    signature is to be before any notary public and returned
```

Kelly Rogers
January 6, 2017

158

1   within 30 days from date of receipt of the transcript.

2   If returned, the attached Changes and Signature Page

3   contains any changes and the reasons therefore:

4           _____ was not requested by the deponent or a party

5   before the completion of the deposition.

6           I further certify that I am neither counsel for,

7   related to, nor employed by any of the parties or

8   attorneys in the action in which this proceeding was

9   taken, and further that I am not financially or otherwise

10  interested in the outcome of the action.

11          Certified to by me on this, the _____ day of

12  _____, 2017.

13

14

15

16

17

18  MIKE R. RASKA, Texas CSR 1473
    Date of Expiration: 12-31-18
19  Firm Registration No. 604
    Raska Reporting
20  4008 Louetta Road, Suite 233
    Spring, Texas 77388
21  (832) 998-0015

22

23

24

25

Kelly Rogers
January 6, 2017

159

COUNTY OF HARRIS   )

STATE OF TEXAS      )


        I hereby certify that the witness was notified on

_____ that the witness has 30 days or

(_____ days per agreement of counsel) after being

notified by the officer that the transcript is available

for review by the witness and if there are changes in the

form or substance to be made, then the witness shall sign

a statement reciting such changes and the reasons given

by the witness for making them;

        That the witness' signature was/was not returned

as of _____.

        Subscribed and sworn to on this, the _____ day

of _____, 2017

_____
MIKE R. RASKA, Texas CSR 1473
Date of Expiration: 12-31-18
Firm Registration No. 604
Raska Reporting
4008 Louetta Road, Suite 233
Spring, Texas 77388
(832) 998-0015